Stephen MIMS, Appellant,

v.

Bernice MIMS, Appellee.

No. 91–FM–437.

District of Columbia Court of Appeals.

Argued March 4, 1993.
Decided Dec. 9, 1993.

David B. Lamb, for appellant.

Robert L. Chaves, for appellee.

Before FERREN, SCHWELB, and FARRELL, Associate Judges.

SCHWELB, Associate Judge:

On March 7, 1991, the trial judge granted Stephen Mims (the father) a judgment of absolute divorce from Bernice Mims (the mother). She awarded the mother custody of the parties' two minor children, and ordered the father to pay $502 bi-weekly in child support. On appeal, the father contends that, because his children live with the mother in Maryland, the motions judge should have granted the father's pretrial motion to apply the Maryland child support guideline rather than the District of Columbia guideline. He also argues that the trial judge erred in granting the mother sole use and possession of the marital home until the parties' younger child reaches the age of eighteen. Finally, he contends that the trial judge erroneously found that the father had voluntarily reduced his income, and that this erroneous finding led to an incorrect calculation of his child support obligation.

We agree with the first two of the father's contentions; only the first requires plenary discussion.[1] Accordingly, we reverse the decision of the trial court and remand for further proceedings consistent with this opinion.[2]

## I.

The parties were married in January 1983 in the District of Columbia. They had two children, who were seven and five years old at the time of the divorce. The couple purchased a marital home in Suitland, Maryland, in May 1988. They separated in September 1988, and the father moved into his mother's house in the District. The mother and the two children continued to live in Maryland. In August 1990, the father filed a complaint for divorce in the Superior Court. The mother filed an answer and counterclaim seeking custody, support, and division of the marital property.

On October 4, 1990, the father's counsel filed a motion to adopt foreign law, and requested the court to apply Maryland's child support guideline, Md.Code Ann., Fam.Law § 12–201, et seq., (1992), instead of the District's, D.C.Code § 16–916.1 (1993). After a hearing, the motions judge denied the request in an order signed on October 31, 1990. The judge concluded that, because the parties were not yet divorced, the children's domicile was that of the father, and that the children were therefore domiciled in the District. The judge also reasoned that if the case had been instituted by the mother pursuant to the Uniform Reciprocal Enforcement of Support Act (URESA), D.C.Code § 30–304 (1988), District of Columbia law would apply. Invoking the District's "governmental interest analysis," the judge concluded that "the party seeking support is not required to be domiciled in the District," and that "the law of the father's domicile should apply."

1. We note with respect to the father's second contention that under Maryland law, which the trial court was required to apply, Williams v. Williams, 390 A.2d 4, 5–6 (D.C.1978), any provision in an order that concerns the family home "shall terminate no later than 3 years after the date on which the court grants an annulment or a limited or absolute divorce." Md.Code.Ann., Fam.Law § 8–210(a)(1) (1991). The mother concedes that the trial judge's order was not in compliance with this statutory limitation, and the divorce decree must be modified accordingly.

2. As to the third contention, the trial judge, who was in the best position to assess the father's credibility, found that the father had voluntarily reduced his income by resigning from a full-time position, retaining only part-time employment. The father had nevertheless managed to stay current on his payments of $750 per month on a sublease of a 1989 Mercedes automobile. "The courts properly show no patience toward a person who seeks to circumvent family obligations

without first decreasing his own expenditures." Benvenuto v. Benvenuto, 389 A.2d 795, 800 (D.C. 1978). We note, on the other hand, that at the time that the father held both full-time and part-time employment, he was working a total of sixty-eight hours a week.

We must remand the case in any event so that the trial court can apply the Maryland guideline instead of the District's. The trial court must then determine whether the father was "voluntarily impoverished" within the meaning of Md. Code Ann., Fam.Law § 12–201(b)(2) (1992); John O. v. Jane O., 90 Md.App. 406, 601 A.2d 149, 156 (1992). It may not be reasonable to expect the father to work sixty-eight hours a week indefinitely, and we therefore suggest that the court take a second look at the father's realistic earning capacity in the current job market. See John O., supra; Freeman v. Freeman, 397 A.2d 554, 555–56 (D.C.1979); cf. Guyton v. Guyton, 602 A.2d 1143, 1145 (D.C.1992).

## II.

■ We are compelled to disagree with the motions judge's conclusion, which rests on an incorrect determination of the children's domicile. "[I]f the father and the mother have separate domiciles, minor children take the domicile of the parent with whom they actually live." *Oxley v. Oxley*, 81 U.S.App.D.C. 346, 347, 159 F.2d 10, 11 (1946); *see also* RESTATEMENT (SECOND) CONFLICT OF LAWS, § 22(1) (1971) ("[a] minor has the same domicil[e] as the parent with whom he lives").[3] Accordingly, the children are domiciled in Maryland.

■ The domicile determination is critical, for there is precedent in this jurisdiction, which was not cited to the trial judge, but which strongly suggests (and at least arguably requires) that we at least presumptively apply the law of the children's domicile. In *Simonds v. Simonds*, 81 U.S.App.D.C. 50, 52, 154 F.2d 326, 328 (1946), decided a quarter of a century before *M.A.P. v. Ryan*, 285 A.2d 310 (D.C.1971), the court held that the question whether a minor domiciled in the District has the right to sue her father, domiciled elsewhere, for support was governed by the law of the District of Columbia.

In *Alves v. Alves*, 346 A.2d 736 (D.C.1975), the issue was whether the parties' 19–year–old son, who lived with his mother in Maryland, was entitled to child support from the father, a domiciliary of the District. The age of majority in Maryland was eighteen, but in the District it was twenty-one. Accordingly, in order to decide whether the father was obliged to continue to support his son, the court was first required to determine whether the question was governed by Maryland law or District of Columbia law. In *Alves*, as

in this case, the father had obtained a divorce in our Superior Court and the litigation was being conducted in a District of Columbia forum. Nevertheless, this court held that

> the domiciliary state being that of the mother, since she has custody, it is the law of Maryland which governs here. We see no reason, therefore, why we should not look to the law of Maryland to determine whether, at the time the trial court had jurisdiction, the son was a minor or an adult.

*Id.* at 739.

■ Given these precedents, and at least in the absence of particularized circumstances requiring a different result, the children's Maryland domicile is at least arguably conclusive. To be sure, both *Simonds* and *Alves* were apparently decided on the basis of the child's domicile alone, and the father has not disputed the motions judge's determination that the "governmental interest analysis" approach, *see, e.g., Rymer v. Pool*, 574 A.2d 283, 285 (D.C.1990), which was not mentioned in either *Simonds* or *Alves*, applies in this case. No decision of this court has been cited to us, however, and we have found none, purporting to overrule *Simonds* or *Alves*, insofar as choice-of-law questions in child support cases are concerned. Even if we were to treat the father's "concession" as amounting to a stipulation that the test applied in these decisions has been superseded,[4] we are not bound by stipulations on questions of law in general, *Sebold v. Sebold*, 143 U.S.App.D.C. 406, 412 n. 8, 444 F.2d 864, 870 n. 8 (1971) (decided several months before *M.A.P. v. Ryan* ), or as to choice of law in particular, *Montgomery Fed. Sav. & Loan*

---

3. We question, but need not decide in this case, whether prior decisions holding that a child's domicile was automatically that of the father, *see, e.g., Schneider v. Schneider*, 78 U.S.App.D.C. 383, 384, 141 F.2d 542, 543 (1944), which were apparently based on the perception of the husband as presumptively the "head" of the household, could survive today's more enlightened approach to distinctions based on an individual's sex. *Cf. Spindel v. Spindel*, 283 F.Supp. 797, 813 (E.D.N.Y.1968) (Weinstein, J.) (legal equality of the sexes renders married woman capable of acquiring domicile separate from her husband,

notwithstanding "ancient doctrine" to the contrary).

4. The father's counsel stated in his brief in this court, that "[t]he motions judge correctly concluded that the District of Columbia has followed the recent trend adopting the governmental interest analysis approach to choice of law questions." Counsel did not cite either *Simonds* or *Alves*, however, and it does not appear that this purported concession or acknowledgment was made with knowledge of these authorities.

*Ass'n v. Baer*, 308 A.2d 768, 770 (D.C.1973).[5] Our obligation under *M.A.P. v. Ryan* to follow otherwise binding precedents does not evaporate because a party has failed to cite them to us.

### III.

■ Even if *Simonds* and *Alves* were no longer good authority—an "if" as formidable as any since Rudyard Kipling's day—the result would still be the same. Application of the governmental interest analysis[6] in this case also requires the choice of Maryland law. The children's domicile in a particular jurisdiction ordinarily provides that jurisdiction with the primary interest in assuring their support.

The interests of the District and Maryland in this controversy are reflected in their respective guidelines. "[S]tatutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning." *J. Parreco & Son v. District of Columbia Rental Hous. Comm'n*, 567 A.2d 43, 46 (D.C.1989) (quoting *Cabell v. Markham*, 148 F.2d 737, 739 (2d Cir.) (Learned Hand, J.), *aff'd*, 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945)). We must therefore identify the purposes of the District of Columbia child support guideline and of its Maryland analogue in relation to the issue presented in this case.

■ Child support is not intended to punish the father, but rather to ensure a decent standard of living for the child. Under the District's guideline, "[c]hild support payments are for the benefit of the children ...

and the children's interest is paramount." *Nevarez v. Nevarez*, 626 A.2d 867, 872 (D.C. 1993) (citation omitted). The non-custodial parent's income is, of course, relevant, but this is because

[a] proper calculation of the costs of rearing a child is dependent upon the income of the parents and is a function of that income; it is inappropriate to attempt to establish the amount of the financial needs of the child as though that figure were independent of parental income.

REPORT OF THE SUPERIOR COURT CHILD SUPPORT GUIDELINES COMMITTEE 10 (April 1988) (quoted in *Fitzgerald v. Fitzgerald*, 566 A.2d 719, 735 n. 5 (D.C.1989)) (separate opinion of Steadman, J.). This is the reason—indeed, the only reason—for the consideration in the guideline of the non-custodial parent's gross income. In other words, the primary purpose of the District's child support legislation is to protect the rights of District of Columbia children, not to penalize District of Columbia fathers. *Cf. Wright v. Wright*, 386 A.2d 1191, 1195 (D.C.1978) (explicating purpose of child support). Indeed, the District of Columbia has no legitimate interest in ensuring that a father who lives in the District must pay more to support Maryland children than an otherwise similarly situated Maryland resident would be required to pay. *Cf. Kaiser Foundation Health Plan v. Rose*, 583 A.2d 156, 159 (D.C.1990).[7]

In the present case, Maryland's "governmental interest" is intrinsically greater than the District's. The children are in Maryland. Their principal expenses are in Maryland.

---

**5.** As Justice Brandeis wrote for the unanimous Court in *Swift & Co. v. Hocking Valley Ry. Co.*, 243 U.S. 281, 289, 37 S.Ct. 287, 289–90, 61 L.Ed. 722 (1917), "[i]f the stipulation is to be treated as an agreement concerning the legal effect of admitted facts, it is obviously inoperative; since the Court cannot be controlled by agreement of counsel on a subsidiary question of law."

**6.** Under this approach, the court first identifies the governmental policies underlying the applicable laws and then determines which jurisdiction's policies would be more significantly advanced by having its law applied. *Stutsman v. Kaiser Found. Health Plan*, 546 A.2d 367, 373 (D.C.1988) (*Stutsman II* ).

**7.** Our dissenting colleague suggests that the Maryland guideline would not require a father whose income increased dramatically to do as much to bring his children's standard of living up to his own standard as the District of Columbia guideline requires. Assuming this to be true, we do not believe it to be consistent with objective choice-of-law principles simply to apply the law of that jurisdiction which would award the children the most. Moreover, there is no suggestion that Mr. Mims has recently become a wealthy man, and we need not and do not decide under what, if any, circumstances a District of Columbia court should apply District law because, as a matter of public policy, the support required by the law of the jurisdiction in which the children reside would be inadequate.

Maryland is the jurisdiction in which the father's non-support would have its impact, and which would have to look after the children if, for example, they became public charges.[8] It is therefore Maryland's responsibility, more or less as *parens patriae*, to determine the needs of Maryland domiciliaries and how those needs should be met. Unlike the District's guideline, the Maryland guideline was promulgated to protect Maryland children. The governmental interest at issue being the assurance of adequate support for children living in the jurisdiction, and the children in this case being Maryland domiciliaries, it is Maryland's guideline which "would be most advanced by having its law applied to the facts before us." *Stutsman II, supra,* 546 A.2d at 373. In his otherwise comprehensive separate opinion, Judge FERREN fails in our view to come meaningfully to grips with this central truth.

■ The mother argues that, if she had sought child support from the father under URESA, "the residence of the obligor parent [would] control when determining the obligation and the level of support." She suggests that we should therefore apply District law in this case, so that the choice of law would be the same no matter which party initiated the suit and which forum was selected for that purpose. The mother's position, however, is founded on a mistaken premise.

If the action had been brought in Maryland, the mother would presumably have registered her judgment in the Superior Court (as did the mother in *Nevarez*) so that she could reach the father's assets in the District and, if possible, his wages. But contrary to the mother's assertion, the choice-of-law provision in the District's URESA statute, D.C.Code § 30–304 (1993), authorizes the Superior Court to apply the law either of the jurisdiction where the father was present during the relevant period or of the jurisdiction where the dependents were present at the time of the non-support.[9] Recently, in *Nevarez,* 626 A.2d at 4 n. 4, this court indicated, in the context of a suit brought in the District pursuant to URESA by a mother who lived with her children in Texas, that the court would at least "arguably be justified in applying the laws of Texas."[10] *Nevarez* thus stands for the proposition that application of the law of the State where the children live is, at least, a permissible alternative which the court is bound to consider. Even if this were a URESA case, which it is not, there is no inexorable statutory command which would then preclude the application of the Maryland guideline.

■ There are concededly factors, which could perhaps be compelling under other factual scenarios, suggesting that we should apply District law. The father chose to bring his action in the District of Columbia.[11] The law of the forum governs "unless

8. As the court stated in a somewhat different context in *Lehmer v. Hardy,* 54 App.D.C. 51, 55, 294 F. 407, 411 (1923),

> [a] minor, like any other person, is entitled to the protection of the laws *of the state or territory in which he abides.*

(Emphasis added).

9. Section 30–304 provides:

> Duties of support enforceable under this chapter are those imposed under the laws of any state [1] in which the defendant was present during the period for which support was sought, or [2] *in which the dependent was present when the failure to support commenced or where the dependent is when the failure to support continues.* The defendant shall be presumed to have been present in the responding state during the period for which support is sought until otherwise shown.

(Emphasis and numerical divisions added).

10. In *Nevarez,* the initial divorce decree had been issued by a Texas court. In that respect, the case

would have been even stronger for applying Texas law than the present case is for application of Maryland law. The father in *Nevarez,* however, having argued in the trial court that Texas law applied, failed to renew his contention to that effect on appeal. Our comment on Texas law was therefore less than a holding on the issue. Cf. *Harris v. Kinard,* 443 A.2d 25, 28 (D.C.1982); *Rittenhouse v. Rittenhouse,* 461 A.2d 465, 466 (D.C.1983).

*Harris* and *Rittenhouse* cannot be construed as *requiring* the court to apply District of Columbia law in a URESA case. Such a result would read out of § 30–304 the provision which allows application of the law of the state in which the dependents were present. See footnote 9, *supra,* and the statutory language there italicized.

11. We note, however, that in this case the District is by far the most convenient forum for both parties. The father lives in the District. The mother lives in Suitland, which is closer to our courthouse than to the Prince George's County

the foreign state has a greater interest in the controversy." *Kaiser–Georgetown Community Health Plan v. Stutsman*, 491 A.2d 502, 509 (D.C.1985) (*Stutsman I*). Moreover, when the interests of both jurisdictions are "equally weighty," we have considered "the substantial savings that can accrue to the State's judicial system when its judges are able to apply law with which they are thoroughly familiar or can easily discover...." *Id.* at 509 n. 10 (citations and internal quotation marks omitted).[12] We are satisfied, however, that these considerations are substantially outweighed, on these particular facts, by the most important reality in this case—namely, that we are dealing with support for children domiciled in Maryland, and that other things being equal, Maryland has

a significantly greater interest than does the District in setting the level of that support. Accordingly, we conclude that the Maryland child support guideline, and not the District's, applies to this case.

### IV.

For the foregoing reasons, the judgment appealed from is reversed in part [13] and the case is remanded for further proceedings consistent with this opinion, including appropriate modifications of the divorce decree.

*So ordered.*[14]

FARRELL, Associate Judge, concurring:

I join Judge SCHWELB'S opinion unqualifiedly. As Judge FERREN concedes in

---

Courthouse in Upper Marlboro. At the time the suit was brought, both parties worked at the Library of Congress, a few blocks from our courthouse. Under these circumstances, it would be inequitable to apply to the father some juridical form of the just desserts theory—"he asked for it and he got it"—when his choice of forum was to the advantage of all concerned.

12. Whatever the significance of our judiciary's unfamiliarity with foreign law may be in other cases, we give that factor little weight here. Such considerations were equally present in *Alves II*, and they were summarily rejected by the court, which saw *"no* reason" for not applying the law of Maryland. 346 A.2d at 739 (emphasis added).

Aside from the authority of *Alves*, Maryland law is not especially difficult for District of Columbia judges to discover. Decisions of the courts of Maryland are accorded the most respectful consideration by our courts. *Roberts–Douglas v. Meares*, 624 A.2d 405, 419 n. 20 (D.C.1992). In fact, the opinions of this court are published in the Maryland Reporter. Maryland's schedule for computing the father's child support obligation is in the statute, Md.Code Fam.Law § 12–204, and thus readily available.

In Part V of his separate opinion, Judge FERREN, articulating his commendable concern for practicality, insists that our decision will overload the judges and hearing commissioners of the Superior Court with endless and unnecessary work. His position is predicated upon his assumption that

as a result of the majority's decision ... District of Columbia judges will apparently have to apply the law of the children's domicile in *all* non-URESA cases, wherever the children live.

(Emphasis in original). Judge FERREN's premise, however, is based on a misreading of our opinion.

Courts do not, or at least should not, issue generalized edicts, nor should they promulgate statute-like rules of law applicable to all future cases, regardless of their facts. Rather, they decide concrete controversies. We do not purport in this opinion to instruct trial judges how to rule on facts substantially different from those here. *See, e.g., Khiem v. United States*, 612 A.2d 160, 164 (D.C.1992), *cert. denied*, — U.S. —, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993). The determination that one jurisdiction or the other has the most significant contacts with the matter in dispute, *see, e.g., Tramontana v. S.A. Empresa de Viacao Aerea Rio Grandense*, 121 U.S.App.D.C. 338, 341, 350 F.2d 468, 471 (1965), *cert. denied*, 383 U.S. 943, 86 S.Ct. 1195, 16 L.Ed.2d 206 (1966), necessarily requires analysis of the totality of the relevant circumstances. If, in an individual case, it would be impossible or inordinately difficult to determine the proper level of support under the law of a particular jurisdiction, then this would obviously add a factor not here present into the judge's calculus.

Finally, application of governmental interest analysis in this case requires some inquiry into Maryland law in any event. The other principal issue raised in this appeal, namely, the question whether the trial judge could properly award the mother exclusive use of the former marital home until the youngest child reached the age of eighteen, is acknowledged by all parties to be governed by Maryland law.

13. Our partial reversal affects only the father's child support obligation and the disposition of the marital home. The parties remain divorced.

14. Since, on remand, the trial court must apply Maryland law, we do not reach the father's remaining contentions, which relate to the calculation of his obligations under the District's guideline.

dissent, there is no "indication" in either statute or case law that Maryland, in applying its child support guideline, would turn a blind eye to that "rare" case, *post* at 332, not exemplified here, in which the noncustodial parent experienced a dramatic increase in his/her standard of living. We should not decide this case on the bare hypothetical possibility of such an outcome. Without a more persuasive demonstration of likely difference in the application of the two guidelines, Judge Schwelb is correct that "the most important reality in this case," in a balancing of governmental interests, is that the children are domiciled in Maryland, where their primary expenses are incurred.

FERREN, Associate Judge, concurring in part and dissenting in part:

I join the majority opinion with respect to disposition of the marital home. See *ante* at 321 note 1. I respectfully dissent, however, from the majority's fundamental ruling that Stephen Mims's child support obligation should be determined by reference to the Maryland child support guideline instead of the District of Columbia guideline.[1] First, I believe the majority has misinterpreted the two precedents that supposedly require us to apply the law of the children's domicile (Maryland) to the issue of child support, *Simonds v. Simonds*, 81 U.S.App.D.C. 50, 154 F.2d 326 (1946), and *Alves v. Alves*, 346 A.2d 736 (D.C.1975) (*Alves II*). The majority, therefore, errs in suggesting, see *ante* Part II., that *M.A.P. v. Ryan*, 285 A.2d 310 (D.C. 1971), requires us to apply the "territorialist"[2] approach to choice-of-law questions represented by *Simonds* and *Alves II*.

Second, the majority erroneously concludes, in the alternative, that even if these precedents no longer are binding, a "governmental interest" approach to choice-of-law would bring about the same result: applying the law of the children's domicile (Maryland). To the contrary, because there is a "false conflict," the law of the forum—the District's child support guideline—applies. But even if there is a "true conflict," the District guideline applies because, as elaborated below, Maryland does not have a "greater interest in the controversy." *Kaiser-Georgetown Community Health Plan, Inc. v. Stutsman*, 491 A.2d 502, 509 (D.C.1985) (*Stutsman I*). Indeed, the District's law—the forum law—would apply under a "governmental interests" analysis even if the interests of both jurisdictions were only "equally weighty." *Id.*

Furthermore, two other factors make even clearer the District's paramount interest. Application of the law of the forum where the noncustodial parent-obligor resides will advance the policy favoring national uniformity in interstate custody disputes, *i.e.*, the policy reflected in the District's Uniform Reciprocal Enforcement of Support Act (URESA), D.C.Code §§ 30–301 to –326 (1993). Moreover, the majority result is utterly impractical; it imposes on Superior Court judges the immense burden of interpreting the child support guidelines of other jurisdictions, not just in this case (where the children live next door in Maryland) but in every action brought initially in our local courts where the children live outside the District of Columbia,

---

1. Notwithstanding Stephen Mims's assertion to the contrary, nothing prevents this court from applying the law of Maryland to the issue of the disposition of the marital home while determining that the law of the District should control the question of child support. The process of applying the law of one jurisdiction to one aspect of a case while determining that the law of another jurisdiction should control another aspect of the same case is known as *depecage*. *See Stutsman v. Kaiser Found. Health Plan*, 546 A.2d 367, 373 (D.C.1988) (*Stutsman II*); *see also Hercules & Co. v. Shama Restaurant*, 566 A.2d 31, 40 (D.C. 1989).

2. The term "territorialist," as devised by conflict-of-law theorists, refers to the traditional ap-

proach to choice of law, based on the idea "that the location of some single significant factor in a transaction should identify the place (state) whose law should govern the transaction." Robert A. Leflar, American Conflicts Law § 86, at 173 (3d ed. 1977). Under this theory,

> [l]and questions were to be governed by the law of the land's situs, most contracts questions by the law of the place where the contract was made, torts questions by the law of the place of harmful impact (place of the tort), procedural questions by the law of the forum, *certain other problems by the law of some person's domicile*, and so on.
>
> *Id.* (emphasis added).

whether in California, Oregon, Mississippi, or Maine.[3]

## I.

We are presented, first, with the question whether binding case law requires the court to apply the law of the children's domicile to determine the level of child support. The majority correctly concludes that the motions judge erred in determining the children's domicile was that of the father, i.e., the District of Columbia. I agree that the children have the domicile of the parent—in this case the mother—with whom they actually live. See Oxley v. Oxley, 81 U.S.App.D.C. 346, 347, 159 F.2d 10, 11 (1946); RESTATEMENT (SECOND) CONFLICT OF LAWS § 22(a). The majority then asserts, however, that Simonds and Alves II "strongly suggest[ ] (and at least arguably require[ ]) that we at least presumptively apply the law of the children's domicile," ante at 322, to decide an award of child support. As the majority's carefully chosen language suggests, Simonds and Alves II are not conclusive.

According to the majority, in Simonds "the court held that the question whether a minor domiciled in the District has the right to sue her father, domiciled elsewhere, for support was governed by the law of the District of Columbia." Ante at 322. That statement is misleading. In Simonds, the child did not actually live with either parent. The mother, who officially had custody, lived in the District; the father, who had the mother's permission for the child to live with him, lived for awhile in Maryland. The child, however, left the father's Maryland home, claiming mistreatment, and lived with a neighbor in Maryland. After the mother filed suit for child support in the District, the father, who owned a business in the District, moved from Maryland to the District. The child apparently remained in Maryland. "In light of the foregoing," 81 U.S.App.D.C. at 52, 154 F.2d at 328, Simonds applied District law, rather

than Maryland law: "Customarily a legitimate child takes the domicile of the father if he be living. . . . Where the father is found to have abandoned the child [as in this case] it will take the domicile of the mother during the remainder of its minority, provided, of course, that [as in this case] the mother has not also abandoned the offspring." Id. at 51–52, 154 F.2d at 327–28 (citations omitted).

Simonds, therefore, was an unusual case where the child's domicile was determined by legal fiction when the parent with whom she was living abandoned her. But even the conclusion that the child was domiciled in the District, not in Maryland where she lived, was not necessarily enough by itself to determine the law governing child support. The court noted, in addition, that the father "owned a business in the District of Columbia" and "since the suit was begun ha[d] moved from Maryland to this jurisdiction," id. at 52, 154 F.2d at 328—two two factors the court expressly added to the child's fictional domicile in ruling that District law governed child support. See id. Plainly, therefore, Simonds does not conclusively stand for the proposition that the law of the child's domicile invariably, or even presumptively, applies in awarding child support.

The majority's invocation of Alves II also requires qualification. In Alves I, 262 A.2d 111 (D.C.1970), which the majority does not cite, this court followed Oxley and the RESTATEMENT in holding that the children were domiciled in Maryland because they lived there with their mother. See Alves I, 262 A.2d at 116. Nonetheless, the court applied the law of the District, the noncustodial father's domicile, in (1) concluding that a separation agreement did not bar consideration of increased child support and, it would appear, in (2) determining the amount of child support the father should pay. See id. at 117–18 (quoting Blumenthal v. Blumenthal, 155 A.2d 525, 526–27 (D.C.1959)).[4]

3. The majority opinion suggests that the ruling in this case may also apply to actions for child support brought under the Uniform Reciprocal Enforcement of Support Act (URESA), D.C.Code §§ 30–301 to –326 (1988). See ante at 324. This suggestion is contrary to our previous rulings interpreting the District's URESA choice-of-law

statute, D.C.Code § 30–304, in a manner that promotes national uniformity in interstate support actions. See infra Part IV.

4. In Alves I, this court also held "that the trial court has jurisdiction to make an award of custody when both parents are personally before the

Later in *Alves II*, on which the majority relies, the father sought to terminate child support for his 19–year–old son because Maryland, where the child lived, had reduced the age of majority to 18. Without citing *Simonds*, this court applied the law of Maryland to the issue of the age of majority: "Generally, the law of the domicile regulates the status of a person as an infant and determines minority or majority." *Id.*, 346 A.2d at 739. But, as in *Alves I*, this court applied the law of the District in determining whether the separation agreement, which had not been incorporated into the divorce decree, barred an increase in child support (we held it did not). *See Alves II*, 346 A.2d at 738 (citing *Lanahan v. Nevius*, 317 A.2d 521, 525 (D.C.1974)). The court concluded its analysis by ruling that the parties had intended, in their agreement, for support to continue to age 21 and, in any event, that Maryland law, although subsequently lowering the age of majority to 18 effective July 1, 1973, required support to age 21 under all decrees entered before that date. The court then remanded for further proceedings without "reason to explore" the mother's contention that the father's use of the District's courts for a divorce and "related purposes" should make him subject to "any burden in the local laws for purposes of the extent of his child support obligations." *Alves II*, 346 A.2d at 740 n. 8. Accordingly, the *Alves* litigation did not establish that the law of a child's domicile, rather than the law of the noncustodial parent's domicile, must be used to determine the amount of child support the noncustodial parent shall pay. That question was expressly left open in *Alves II*.

## II.

Even if we assume for the sake of argument that *Simonds* and *Alves II* say what the majority suggests they do, *i.e.*, that the law of a child's domicile governs the calculation of child support, I do not agree that *M.A.P. v. Ryan* requires us to apply here that traditional, "territorialist" approach to choice-of-law. See *supra* note 2.

In *M.A.P. v. Ryan*, this court, "[a]s a matter of internal policy, ... adopted the rule that no division of this court will overrule a prior decision of this court or refuse to follow a decision of the United States Court of Appeals [for the District of Columbia Circuit] rendered prior to February 1, 1971, and that such result can only be accomplished by this court en banc." *Id.*, 285 A.2d at 312 (footnote omitted). After the *Simonds* decision in 1946, however, but before February 1, 1971, when the *M.A.P.* rule became effective, the D.C. Circuit adopted the "governmental interest" analysis approach to choice of law questions. *See, e.g., Gaither v. Myers*, 131 U.S.App.D.C. 216, 404 F.2d 216 (1968); *Tramontana v. S.A. Empresa de Viacao Aerea Rio Grandense*, 121 U.S.App.D.C. 338, 350 F.2d 468 (1965), *cert. denied*, 383 U.S. 943, 86 S.Ct. 1195, 16 L.Ed.2d 206 (1966); *see also* Gary L. Milhollin, *The New Law of Choice of Law in the District of Columbia*, 24 Cath. U.L.Rev. 448, 448 n. 1 (1975) (discussing relationship of such cases to *M.A.P. v. Ryan*). This court also adopted the "governmental interest" approach before 1971. *See Fowler v. A & A Co.*, 262 A.2d 344 (D.C.1970); *McCrossin v. Hicks Chevrolet, Inc.*, 248 A.2d 917 (D.C.1969); *see also*

court, even if the children are neither domiciled in nor living in the District of Columbia." 262 A.2d at 116. The fact that the mother in *Alves I* personally appeared before the trial court made the situation distinguishable from that in *Oxley*, where the United States Court of Appeals for the District of Columbia Circuit ruled that the District of Columbia courts did not have jurisdiction to determine the children's custody when the children were domiciled in North Carolina with their mother, who did not personally appear. *Oxley*, 81 U.S.App.D.C. at 347, 159 F.2d at 11.

The holding of *Alves I* giving a trial court jurisdiction to determine custody of children, regardless of where they actually live, so long as the parents both appear personally, probably has not survived the District's enactment of the Uniform Child Custody Jurisdiction Act, D.C.Code § 16–4503 (1989). *See Creamer v. Creamer*, 482 A.2d 346, 349 n. 2 (D.C.1984). Although the trial court did not make specific findings regarding the basis for its jurisdiction before granting Bernice Mims custody of Stephen Mims's children, no issue regarding the children's custody is before this court on appeal; the only issues before us involving the Mims children concern their support. As the motions court correctly noted, there is no requirement that a party seeking child support under D.C.Code § 16–916 be domiciled in the District. *See Brown v. Dyer*, 489 A.2d 1081, 1083 (D.C.1985).

*Williams v. Williams,* 390 A.2d 4, 5 (D.C. 1978) ("The District of Columbia has followed the recent trend adopting the 'governmental interest analysis' approach to resolve choice of law questions."); Milhollin, 24 CATH. U.L.REV. at 448 n. 1.

Given cases from both the D.C. Circuit and this court adopting a "governmental interest" analysis for choice of law questions before 1971—and well before *Alves II* in 1975— there is considerable doubt whether in *Alves II* this court acted correctly in applying, automatically, the law of the children's domicile to the question of the relevant age of majority (for purposes of determining whether child support should continue), rather than analyzing that issue by reference to competing governmental interests. We have since indicated that, if a situation arises in which a division of this court has ignored the legal rules established by binding precedents of the D.C. Circuit, *M.A.P. v. Ryan* compels us to follow the earlier D.C. Circuit precedent. *See Taylor v. First Am. Title Co.,* 477 A.2d 227, 230 (D.C.1984); *see also McQueen v. Lustine Realty Co.,* 547 A.2d 172, 174 (D.C. 1988) (en banc). That principle would seem to apply all the more so when a division of this court ignores a binding precedent of this court; the earlier decision, not the later one, binds future decisions. *Cf. Taylor, supra.* It would appear, therefore, that in *Fowler* and *McCrossin* this court adopted—before *Alves II*—the "governmental interest" approach to choice of law analysis, derived from D.C. Circuit decisions. It would follow that *Alves II,* employing a "territorialist" approach, was improperly analyzed and thus is inapplicable here.[5]

This court need not decide at this time, however, whether *M.A.P. v. Ryan* requires us to adopt the "territorialist" approach of *Simonds* and *Alves II.* Stephen Mims has expressly acknowledged in his opening brief that the law of the District of Columbia requires a "governmental interest" analysis to resolve the choice of law question presented in his motion to adopt foreign law. Appellant's Brief at 16. He does not argue that domestic relations cases should be governed in principle by a different, "territorialist" choice of law analysis in vogue at an earlier time and no longer followed in other kinds of cases. Because the parties, therefore, agree on the choice-of-law analysis required, and because the "governmental interest" analysis has a principled case law foundation, we should not go further into the matter to resolve definitively whether *M.A.P. v. Ryan* binds this court to apply the "territorialist" approach of *Alves II* or not. As the case is presented, we should apply a governmental interest analysis. This court is not duty bound to resolve an issue of law that the parties do not contest. *See Carducci v. Regan,* 230 U.S.App.D.C. 80, 86, 714 F.2d 171, 177 (1983)[6]; *see generally Rose v. United*

---

**5.** There is an interesting, complex question whether the D.C. Circuit cases and this court's cases decided after *Simonds,* but before February 1, 1971, should be understood to have adopted a "governmental interest" analysis (1) for choice of law issues across the board, or (2) only for each category of case at issue, *e.g.,* tort, inheritance, contracts. If the former is true—if, for example, the D.C. Circuit's decisions in *Tramontana* (tort) and *Gaither* (tort), and this court's decisions in *Fowler* (contract) and *McCrossin* (implied warranty), announced a universal rule that made the *Simonds* "territorialist" analysis obsolete—then *Simonds* was no longer good law when *Alves II* was decided, and the *Alves II* approach was invalid at the time, as well as invalid now. If, however, the latter approach—*i.e.,* a categorical choice of law analysis—is correct, then *Simonds* presumably survived after February 1, 1971, unaffected by *Tramontana* and *Gaither,* or by *Fowler* and *McCrossin,* and, as a consequence, the "territorialist" approach of *Simonds* and *Alves II* survives.

**6.** In *Carducci,* 230 U.S.App.D.C. at 86, 714 F.2d at 177, the court said:

> The premise of our adversarial system is that appellate courts do not sit as self-directed board of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them. Thus, Rule 28(a)(4) of the Federal Rules of Appellate Procedure requires that the appellant's brief contain "the contentions of the appellant with respect to the issues presented, and the reasons therefor, with citations to the authorities, statutes and parts of the record relied on." Failure to enforce this requirement will ultimately deprive us in substantial measure of that assistance of counsel which the system assumes—a deficiency that we can perhaps supply by other means, but not without altering the character of our institution. Of course not all legal arguments bearing upon the issue in question will always be identified by counsel, and we are not precluded from supplementing the contentions of counsel through

*States,* 629 A.2d 526 (D.C.1993) (declining to consider *sua sponte* argument not raised on appeal).

## III.

According to the majority, even if *Simonds* and *Alves II* no longer are binding, a "governmental interest" analysis still compels the court to apply the law of the children's domicile to child support calculations. The majority reaches this result, as I see it, by conducting its "governmental interest" analysis improperly, reducing the process to little more than the "territorialist" approach in disguise. As the majority puts it: "The children's domicile in a particular jurisdiction ordinarily provides that jurisdiction with the primary interest in assuring their support." *Ante* at 323.

## A.

This court has held that a "governmental interest" analysis requires the court to conduct a two-step inquiry: "the first identifying the governmental policies underlying the applicable laws, and the second determining which jurisdiction's policy would be most advanced by having its law applied to the facts of the case before us." *Stutsman v. Kaiser Found. Health Plan,* 546 A.2d 367, 373 (D.C. 1988) (*Stutsman II* ). Sometimes the first

inquiry, into the jurisdictions' respective policies, reveals no conflict at all. "A 'false conflict' occurs when the policy of one state would be advanced by application of its law, while that of the other state would not be advanced by application of its law. In such a situation, the law of the interested jurisdiction prevails." *Rong Yao Zhou v. Jennifer Mall Restaurant, Inc.,* 534 A.2d 1268, 1270–71 (D.C.1987).[7] In contrast, "[a] true conflict is presented when both states have an interest in applying their own laws to the underlying facts; in that event, the forum law will be applied unless the foreign state has a greater interest in the controversy." *Stutsman I,* 491 A.2d at 509. Finally, this court has noted that "[t]he forum State's interest in the fair and efficient administration of justice together with the substantial savings that can accrue to the State's judicial system when its judges are able to apply law with which they are thoroughly familiar or can easily discover, tilt the balance in favor of applying the law of the forum state when the interests of both jurisdictions are equally weighty." *Id.* at 509 n. 10 (internal quotation marks and brackets omitted).

These principles, taken together, mean that the forum state should apply its own law unless the foreign state is clearly a more interested jurisdiction.[8] In this case, the

---

our own deliberation and research. But where counsel has made no attempt to address the issue, we will not remedy the defect, especially where, as here, "important questions of far-reaching significance" are involved. *Alabama Power Co. v. Gorsuch,* 672 F.2d 1, 7 (D.C.Cir.1982).

7. The term "false conflict," as it is used in governmental interest analysis, may be misleading. A "false conflict" does not necessarily mean that the laws of the states involved are identical or that no choice-of-law problem exists. Rather, the term means only that the governmental interests, as revealed during the analysis of the states' policies underlying their respective laws, do not conflict. *See* LEFLAR, *supra* note 2, § 93, at 187.

8. Scholars who have studied courts' applications of "governmental interest analysis" to determine choice of law have noted that the results typically favor forum, not foreign, law. *See* EUGENE F. SCOLES & PETER HAY, CONFLICT OF LAWS § 2.6, at 18 (2d ed. 1992) ("regardless of whether the case is a 'false' or a 'true' conflict, [Professor] Currie's [governmental interest] analysis will always lead

to forum law except in those cases in which the policy of the forum does not call for the application of its law") (citing Brainerd Currie, *Notes on Methods and Objectives in the Conflict of Laws,* 1959 DUKE L.J. 171). Professor Leflar has noted, however, "that a number of courts, purporting to follow Currie's governmental interest theory, have to some extent dropped the forum preference aspect of it, and have engaged in the comparisons of governmental interest which Currie deplored, applying the law of the state deemed to have the greater interest, forum or not." LEFLAR, *supra* note 2, § 92 at 186. This court in *Stutsman I,* 491 A.2d at 509 & n. 10, has interpreted "governmental interest analysis" to require this comparative approach, preferring the law of the forum only when the forum jurisdiction's interest is "greater" or the jurisdictions' respective interests are "equally weighty." *Id.* This comparative approach has moved traditional "governmental interest analysis" from the forum law bias reflected in Professor Currie's writings to a more neutral, "functional analysis." *See* SCOLES & HAY, *supra,* § 2.8, at 23–26 (citing *inter alia* ARTHUR TAYLOR VON MEHREN & DONALD THEODORE TRAUTMAN, THE LAW OF MULTISTATE PROBLEMS (1965)).

motions court found that a false conflict existed, and thus District law should apply, because application of the District's child support guideline would advance its policies while "non-application of Maryland's guideline would not detract from Maryland's policy." In giving reasons for its conclusion, the motions court stated that Maryland's guideline was merely discretionary while the District's was presumptive. Stephen Mims is correct in pointing out the court's error. On April 10, 1990, more than six months before the motions court denied Mims's motion, the Maryland child support guideline became presumptive. *See* Md.Code Ann., Fam.Law § 12–202(a) (1991); *Krikstan v. Krikstan,* 90 Md.App. 462, 601 A.2d 1127, 1131 (1992); *Tannehill v. Tannehill,* 88 Md.App. 4, 591 A.2d 888, 891–92 (1991); *Gates v. Gates,* 83 Md.App. 661, 577 A.2d 382, 384–85 (1990). The motions court's mistake on this point does not end the governmental interest analysis, however, because it is a harmless mistake; the motions court was correct—there is a false conflict here—though for an incorrect reason.

### B.

The majority properly states the first step of the "governmental interest" analysis indicated by *Stutsman II,* 546 A.2d at 373: "identify[ing] the purposes of the District of Columbia child support guideline and of its Maryland analogue in relation to the issue presented in this case." *Ante* at 323. The majority, however, errs in identifying the respective policies underlying District law and Maryland law.

### (1)

Both Maryland and the District adopted their child support guidelines in response to the mandate imposed by the same federal legislation, the Child Support Enforcement Amendments of 1984, conditioning disbursement of funding for Aid to Families with Dependent Children on compliance with increased enforcement procedures. Child Support Enforcement Amendment of 1984, Pub.L. No. 98–378, 98 Stat. 1305 (1984). One of the provisions required states to issue child support guidelines. 42 U.S.C.A. § 667 (1991). In 1988, Congress made the guidelines presumptive. Family Support Act of 1988, Pub.L. No. 100–485, § 103(a)(2), 102 Stat. 2346 (1988). *See also Fitzgerald v. Fitzgerald,* 566 A.2d 719, 723 (D.C.1989). "The legislation did not specify the contents of the guidelines or the particular goals to which they should aspire." *Fitzgerald,* 566 A.2d at 724. According to the legislative history of the 1984 amendments, "[t]he exact nature of the guidelines will be determined by each State." S.Rep. No. 387, 98th Cong., 2d Sess. 40 (1984), *reprinted in* 1984 U.S.C.C.A.N. 2397, 2436. This legislative history noted that, in states where guidelines were already established, "the existence of guidelines tends to assure that there is reasonable consideration given both to the needs of the child and the ability of the absent parent to pay." *Id.*

The Maryland Court of Appeals, in reviewing Maryland's response to the federal mandate for child support guidelines, determined that "the General Assembly chose to base Maryland's guidelines on the Income Shares Model." *Voishan v. Palma,* 327 Md. 318, 609 A.2d 319, 321 (1992). The Maryland court elaborated:

> The conceptual underpinning of this model is that a child should receive the same proportion of parental income, and thereby enjoy the standard of living, he or she would have experienced had the child's parents remained together. Accordingly, the model establishes child support obligations *based on estimates of the percentage of income that parents in an intact household typically spend on their children.*

*Id.* (emphasis added) (citations omitted).

The District guideline, however, does not merely echo the goal of the Maryland guideline in giving the children the benefit of the standard of living they would have enjoyed had the household remained intact, as announced in *Voishan.* The District goes a step further in seeking to assure that, in addition to the level of support the children would have received from an intact family, the children receive whatever additional advantages there may be, if any, from the noncustodial parent's revised quality of life.

D.C.Code § 16–916.1(b)(3) (1993 Supp.) provides:

> A parent has the responsibility to meet the child's basic needs as well as to provide additional child support above the basic needs level. [1] The relative standard of living of each household shall be considered in the child support award, and a child shall not bear a disproportionate share of the economic consequences of the existence of 2 households rather than 1. [2] When child support is established, *the child shall not live at a standard substantially below that of the noncustodial parent.*

(Emphasis added.) Thus, the District's law incorporates the Maryland policy of giving the children the benefit of the standard of living they would have enjoyed if the household had remained intact; *i.e.,* "a child shall not bear a disproportionate share of the economic consequences of the existence of 2 households rather than 1." D.C.Code § 16–916.1(b)(3). But the District's law adds another goal of seeking to assure that the children receive the advantages of the noncustodial parent's quality of life if it becomes higher, for some reason, than the intact family would have achieved; *i.e.,* "the child shall not live at a standard substantially below that of the noncustodial parent." *Id.*[9]

For example, a noncustodial parent, relieved of some family responsibilities, might be able—and choose—to earn a higher income by working longer hours or by attracting more business clientele through more business travel and entertainment than was possible when the household was intact. While the District guideline takes this kind of scenario into account, the Maryland guideline apparently does not. On the other hand, because Maryland bases the child's standard of living on a prescribed proportion of total parental income, *see Voishan,* 609 A.2d at 321, apparently presumed to be maximized when a family stays intact, it is not clear that Maryland has adopted a policy that would be undermined if a court were to order the child to share in the noncustodial parent's increased income when that increase reflects *more* than the intact family might have been expected to receive.

More specifically, Maryland appears to have premised its child support guideline on an assumption that in all cases total parental income available for child support will be greater when the family is living intact than when living in two households. The District guideline has incorporated this premise, but the District also has allowed for the additional possibility—rare as it may be—that an increase in the noncustodial parent's income may make the total parental income available for child support greater, not lower, because the households are separate. The fact that the District expects a child to benefit proportionally from all increases in parental income, even those that are demonstrably greater than increases to be expected for an intact family, does not necessarily detract from a Maryland policy that seeks to achieve the same end but assumes an intact family would achieve the highest possible income in every case.

I have found no indication that Maryland, by using an intact family premise for its child support guideline, actually intended to assure a noncustodial parent that income increases beyond those to be expected from an intact family would be exempt from the child support obligation. On the other hand, given Maryland's intact family model, I also cannot be sure that Maryland did not actually reject the District's premise that a noncustodial parent, whose freedom has facilitated a considerable increase in income, should pay greater child support than the parent would have been expected to pay if the family had remained intact. Arguably, policy differences are discernible in the different models adopted by the two jurisdictions.

### (2)

The majority fails to identify the two differently-stated goals underlying the Dis-

---

9. *See Galbis v. Nadal,* 626 A.2d 26, 31 (D.C.1993) ("the child's needs should not be interpreted so narrowly as to deprive the child of the quality of life enjoyed by the noncustodial parent"); *Graham v. Graham,* 597 A.2d 355, 358 (D.C.1991) (in considering motion to modify existing support order, "trial court may act to ensure that where there is a material increase in non-custodial parents' financial resources, ... these parents do not increase their own standard of living without also ensuring that their children live as well as they").

trict's and Maryland's respective child support policies. As a result, the majority completely avoids coming to grips with the second goal of the District's policy set forth in D.C.Code § 16–916.1(b)(3): "the child shall not live at a standard substantially below that of the noncustodial parent." This clearly stated goal does more than "ensure a decent standard of living for the child," *ante* at 323, by which the majority apparently means sufficient support to keep the child from becoming a "public charge[ ]," *ante* at 324. Rather, the District's policy takes into account the tendency for the standard of living of some noncustodial parents to increase dramatically after divorce, while the standard of living of custodial parents and the children living with them often plummets. As elaborated above, the Maryland guideline attempts to establish for the children the standard of living they would have had if there had been no divorce. *See Voishan,* 609 A.2d at 321. But the District guideline seeks even more for the children: the *new* standard of living of the noncustodial parent, if higher than the standard of the intact family. *See* D.C.Code § 16–916.1(b)(3).

The majority implicitly concludes that the second goal of the District policy is punitive in its treatment of noncustodial parents: "Child support is not intended to punish the father." *Ante* at 323. The majority, therefore, apparently attempts to read the second goal of D.C.Code § 16–916.1(b)(3) out of existence: "[T]he District of Columbia has no *legitimate* interest in ensuring that a father who lives in the District must pay more to support Maryland children than an otherwise similarly situated Maryland resident would be required to pay." *Ante* at 323 (emphasis added). I do not find the District's policy at all punitive. In any event, I see no reason—and the majority offers no reason I can discern—why the legislature cannot "legitimately" adopt a policy that discourages noncustodial parents who choose to live in the District from improving their standard of living at the expense of their own children, regardless of where those children may live.

The majority not only characterizes the District's child support policies incorrectly but also fails to state clearly what, in its view,

the policy underlying the Maryland guideline is. The majority seems to be saying that the policy underlying Maryland's guideline is simply "the assurance of adequate support for children living in the jurisdiction." *Ante* at 324. Furthermore, the majority apparently believes that an important concern for Maryland is preserving the government from any potential responsibility "to look after the children if, for example, they became public charges." *Ante* at 324. The majority cites no Maryland authority for this interpretation, which directly contradicts the policy statement, presented in *Voishan,* 609 A.2d at 321, based on legislative history reflecting adoption of the "Income Shares Model."

\* \* \* \* \* \*

In sum, the majority fails to identify and compare the different child support policies under District and Maryland law, respectively, and thus errs in conducting the first step of the governmental interest analysis that requires such comparative identifications.

### C.

The majority also purports to conduct the second step of the "governmental interest" analysis, "determining which jurisdiction's policy would be most advanced by having its law applied to the facts of the case before us." *Stutsman II,* 546 A.2d at 373. Because the majority has never clearly established what Maryland's policy is, however, it cannot properly execute this step of the analysis. If I am correct that the majority is really saying—*Voishan* to the contrary—that Maryland's policy underlying its child support guideline is merely to assure "adequate support" so that its children do not become "public charges," then the majority is also saying that this policy clearly trumps the District's policy of trying to assure that the children enjoy the standard of living of the noncustodial parent. Instead of explicitly embracing this reasoning, however, the majority resorts to the fact that Maryland is the children's domicile and summarily concludes that this fact automatically gives Maryland the greater interest. This intellectual shortcut makes "governmental interest" analysis indistinguishable from the traditional, "terri-

torialist" approach to choice-of-law questions. See *supra* note 2.

The majority's method of reducing "governmental interest" analysis to the "territorialist" approach resembles the argument presented to this court by Stephen Mims, that "[p]resumably each jurisdiction considered such factors as the cost of rearing a child in [its] jurisdiction when the guideline formula[ ] was developed." Appellant's Brief at 17. Like the majority, Mims reasons that, because his children live in Maryland, Maryland's guideline should apply in determining what support is adequate for them. This argument, however—premised on a "true conflict" in which Maryland's interest is allegedly "greater," *Stutsman I*, 491 A.2d at 509; see *ante* at 324—does not come to grips with the governmental policies respectively underlying the child support guidelines in the two jurisdictions. I do not believe that weighing the governmental interests can be reduced, as the majority would have it, merely to a territorialist analysis, applying the law of the children's domicile, whether that costs the noncustodial parent more—or less—in child support than the law of the jurisdiction where that parent resides would require.

Furthermore, the majority's approach overlooks the possibility of a "false conflict" in the "governmental interest" approach to choice of law analysis. More specifically, in this case, application of District of Columbia law would keep the children from becoming public charges (the majority's version of Maryland's policy), would give the children the standard of living they would have had if there had been no divorce (*Voishan*'s version of Maryland's policy), *and* would allow the children to share in the noncustodial parent's possibly (though not necessarily) even higher standard of living (District policy as conveyed by D.C.Code § 16–916.1(b)(3)). This situation, therefore, is a classic example of a "false conflict" according to *Rong Yao Zhou*: "[T]he policy of one state [the District] would be advanced by application of its law, while that of the other state [Maryland] would not be advanced by application of its law." 534 A.2d at 1270–71. The only way this reasoning could fail would be if Maryland had ex-

pressed a policy *not* to allow the children to share in any increased standard of living of the noncustodial parent beyond that assignable, hypothetically, to the formerly intact family. The majority has produced no evidence that Maryland has such a policy.

But even if this case presents a "true conflict," not a "false conflict," the conflict does not indicate that Maryland law should apply; the facts do not show that Maryland has a "greater interest in the controversy." *Stutsman I*, 491 A.2d at 509. Clearly, the District has an interest in application of its child support guideline to parents who reside in the District (an interest the majority never really recognizes), whereas Maryland presumably has little interest—and certainly no "greater interest," *id.*—in applying its guideline to a nonresident of Maryland if the children living in Maryland would not be prejudiced by application of a foreign (here, the District) guideline. That is the case here.

### D.

There are two other governmental interests favoring application of the District guideline. As elaborated below in Part IV., if this case had been brought in Maryland under URESA, enacted in Maryland as well as in the District,[10] the District guideline would apply because typically, under URESA, the applicable substantive law comes from the jurisdiction where the parent-obligor resided during the period for which support is sought (although under the District's URESA there is some flexibility here). Thus, application of the District guideline would promote the interest of uniformity in interstate child support cases.

Furthermore, Stephen Mims, a resident of the District, chose the District as the forum for deciding his child support obligation when he could just as appropriately have filed his divorce action in Maryland. He therefore has enlisted the resources of this jurisdiction, including a judiciary primarily familiar with interpreting and applying District law. As elaborated below in Part V., the judges' familiarity with local law is a significant factor

10. *See* Md.Code Ann., Fam.Law §§ 10–301 to  –340 (1991). *See also supra* note 3.

favoring the law of the forum state. *See Stutsman I*, 491 A.2d at 509 n. 10.

For all the foregoing reasons, it is clear that Maryland does not have "a greater interest in the controversy" than the District. *Stutsman I*, 491 A.2d at 509. Indeed, it would appear, on balance, that the District's interests are substantially greater. But even if the interests of both jurisdictions were only "equally weighty," *id.*, the law of the forum— the District—still would apply under applicable "governmental interest" analysis. This court, therefore could confidently conclude that the District child support guideline should apply here. A "governmental interest" analysis, conducted correctly, "reveals that the District has a substantial interest in this litigation, and that [Maryland's] interests would in fact be well-served, and its public policy not contravened, by the application of District law to the action." *Id.* at 511.

## IV.

A comparison of the result here with the results obtainable under URESA is important, for the majority embarks on a path that foreshadows discontinuity, even chaos, in interstate child support litigation. The majority's holding undermines the goal of national uniformity in interstate support actions promoted by URESA. The basic premise of URESA, reflected in its name, is *uniformity*. The majority opinion in effect repudiates this court's traditional interpretation of the District's URESA choice-of-law provision that has furthered the goal of national uniformity.

In this case, the father sued for divorce in the District, and the mother—who lives with the children in Maryland—answered the father's complaint and counterclaimed for custody, child support, and division of marital property. The child support proceeding, however, could just as easily have begun as a URESA action filed by the mother in Maryland and transferred for resolution in the District where the courts have jurisdiction over the father. Had that happened—as elaborated below—the Superior Court, applying URESA, would have awarded child support by reference to the District's own guideline, not Maryland's. It is important to understand why this is true, in order to demonstrate why the majority's disposition here is anomalous.

If Bernice Mims had sought child support from Stephen Mims by filing a URESA petition in Maryland, the following procedures would have applied, with the District in the role of "responding state":

Under both Maryland and District of Columbia URESA laws, the duty of the court in the state where a petition for support is filed is merely to determine if the petition sets forth a *prima facie* case for support.... If so, the court so certifies and transfers the petition to the responding state.

The URESA provision of the District of Columbia and Maryland indicates that subsequent to the transfer of the petition, the court in the responding state will make an independent determination of whether the respondent in fact owes a duty of support to the petitioner. When the District as the responding state independently finds a duty of support as defined by District of Columbia URESA, it may order the defendant to pay such amount under such terms and conditions as the court may deem proper. D.C.Code [ ] § 30–315.

*Harris v. Kinard*, 443 A.2d 25, 26–27 (D.C. 1982) (footnote omitted); *see also Virginia ex rel. Halsey v. Autry*, 293 Md. 53, 441 A.2d 1056, 1059 (1982). "The URESA provisions of Maryland and the District liberally define duties of support to include any duty of support imposed by statute or common law." *Harris*, 443 A.2d at 27 (footnote omitted); *see* D.C.Code § 30–302(5); Md.Code Ann., Fam.Law § 10–301(c). The question then becomes: what child support law does the District, as the responding state, apply—the law of the District or of Maryland?

The District's URESA choice-of-law provision, enacted by Congress in 1957, does not precisely follow the language of any of the versions of the model uniform act. *See* REVISED UNIF.RECIPROCAL ENFORCEMENT OF SUPPORT ACT § 7, 9B U.L.A. 423 (1968); UNIF.RECIPROCAL ENFORCEMENT OF SUPPORT ACT § 7 & cmt. (1952), 9B U.L.A. 575–76 (1958). The choice-of-law text adopted for

the District provides more options than the model uniform statute does:

> Duties of support enforceable under this chapter are those imposed under the laws of any state [1] in which the defendant was present during the period for which support is sought, *or [2] in which the dependent was present when the failure to support commenced or where the dependent is when the failure to support continues.* The defendant shall be presumed to have been present in the responding state during the period for which support is sought until otherwise shown.

D.C.Code § 30–304 (emphasis added).

In theory, D.C.Code § 30–304 allows a District of Columbia court to choose whether to apply the District's or Maryland's guideline, *i.e.,* the law where either the "defendant" or the "dependent resides." *See Nevarez v. Nevarez,* 626 A.2d 867, 869 n. 4 (D.C. 1993) (dicta) ("The parties' children continue to live in Texas, and the decree which the Superior Court judge has modified was issued by a Texas judge. A court might therefore arguably be justified in applying the laws of Texas, the state where 'the dependent[s] [were] present,' . . . to this controversy.").

In contrast, Maryland's URESA choice of law provision follows exactly the language of the current version of the model uniform statute, REVISED UNIF.RECIPROCAL ENFORCEMENT OF SUPPORT ACT § 7, 9B U.L.A. at 423:

> Duties of support applicable under this subtitle are those imposed under the laws of *any state where the obligor was present during the period for which support is sought.* The obligor is presumed to have been present in the responding state during the period for which support is sought until otherwise shown.

Md.Code Ann., Fam.Law § 10–307 (emphasis added). If this statute applied to the present

case, the interpretation put forth by Maryland's highest court would require a District of Columbia court to apply the District's guideline—the law of the place "where the obligor was present"—in establishing the level of Stephen Mims's child support payments for his children in Maryland. "In determining whether and to what extent a duty of support is imposed . . ., ordinarily it is the law of the responding state, and not the law of the initiating state, which governs." *Autry,* 441 A.2d at 1059.[11]

But Maryland's choice of law rule does not apply. As demonstrated above, if Bernice Mims had filed a URESA action in Maryland against Stephen Mims, a resident of the District, the applicable child support guideline would be determined by reference to the District's URESA choice-of-law provision. *See* D.C.Code § 30–304; *Harris,* 443 A.2d at 27–28. More specifically, the URESA of the initiating state (Maryland) applies "merely to determine if the petition sets forth a *prima facie* case for support." *Harris,* 443 A.2d at 26. If it does, and the case is therefore transferred to the responding state (District of Columbia) where the court has jurisdiction over the putative defendant-obligor, the law of the responding state—including its choice-of-law provision—applies to determine, definitively, whether the defendant owes a duty of support and, if so, the amount of that support. *Id.* at 27–28. One cannot say for sure how a District of Columbia court, writing on a clean slate, might go about making a choice among the child support guidelines "of any state in which the defendant was present during the period for which support is sought, or in which the dependent was present when the failure to support commenced or where the dependent is when the failure to support continues," as authorized by D.C.Code § 30–304.[12] Everyone would have to agree, however, that in the interest of national uniformity this court has consistent-

---

11. It is strange, to say the least, in light of Maryland's policy of uniformity under URESA that would defer to the District guideline, for the majority to conclude that Maryland's interest in imposing its own guideline here is somehow greater than the District's interest in applying the District guideline.

12. One way of looking at the URESA choice of law provision, D.C.Code § 30–304, is to say that, by providing options, the statute incorporates a "governmental interest" analysis, and that under that analysis our case law has consistently reflected a paramount interest in applying the District's child support law when the defendant-obligor lives here.

ly interpreted § 30–304 as if it read the same as Maryland's URESA choice-of-law statute. For example, in *Cobbe v. Cobbe*, 163 A.2d 333 (D.C.1960), where the District was the "initiating state," our predecessor, the Municipal Court of Appeals, held that the law of the responding jurisdiction should determine the duty of support. *Id.* at 336–37; *see Harris*, 443 A.2d at 28 (clarifying holding in *Cobbe*). The court noted in *Cobbe* that "[t]his view limits the choices available to the obligee under [D.C.Code § 30–304], but we think it represents the prevailing thought in the country today." *Cobbe*, 163 A.2d at 336.

Although *Cobbe* does not necessarily preclude the possibility that a District of Columbia court could apply the guideline of the dependent's jurisdiction, *e.g.*, Maryland, when the District is the "responding state," this court apparently has never taken such a position. Our decisions have all concerned rulings that applied the substantive child support law of the responding state—the District of Columbia—where the defendant, not the dependent, was present. *See, e.g., Rittenhouse v. Rittenhouse*, 461 A.2d 465, 466 (D.C.1983) (under District law appellant required to support child until age 21, even though support only required until 18 in Maryland, where child lived); *Harris*, 443 A.2d at 28 (Maryland statute of limitations does not apply when D.C. is "responding state"); *Howze v. Howze*, 225 A.2d 477, 479 (D.C.) (parent in D.C., the responding state, required to provide support until child's eighteenth birthday, despite Michigan divorce decree requiring payments only until age 17), *appeal dismissed*, 128 U.S.App.D.C. 204, 385 F.2d 986 (1967); *Prager v. Smith*, 195 A.2d 257, 258–59 (D.C.1963) (when petition for support forwarded from New York, D.C. court had to determine under D.C. statute whether appellant owed duty of support and, if so, in what amount).

The present case, which was not brought under URESA, does not require a decision about the proper interpretation of the District's URESA choice-of-law provision. Given the state of the case law discussed above, that may be an issue only our en banc court can definitively answer. *See M.A.P. v. Ryan*, 285 A.2d at 312.[13] The point is, however, that under present interpretation of the District's URESA choice-of-law provisions, the District's child support guideline would apply if Bernice Mims had filed this action under URESA in Maryland—a result at odds with the majority position here that concludes Maryland would have a paramount interest in applying its own guideline on the facts here.

### V.

In adopting a rule directly contrary to the goal of national uniformity in interstate support actions promoted by the model URESA choice-of-law provision, the majority imposes on our trial judges the extraordinary burden of interpreting the child support guidelines of other jurisdictions, not just in this case but in every action for child support brought in our courts for the benefit of children who live outside the District. Contrary to *Stutsman I*, 491 A.2d at 509 n. 10, the majority gives "little weight," *ante* at 325 n. 12 to the unfamiliarity of District of Columbia judges with foreign child support laws simply because Superior Court judges supposedly are familiar with, or at least can easily ascertain, Maryland law, which applies in this case. As a result of the majority's decision, however, District of Columbia judges apparently will have to apply the law of the children's domicile in *all* non-URESA cases, wherever the children live. The majority has not given a clue as to how it could be otherwise in any case, for its "governmental interest" analysis is basically a "territorialist" deference to the law of the child's domicile. Superior Court

---

**13.** In *Rittenhouse*, a URESA case, this court applied the law of the District, the noncustodial parent's domicile, rather than the law of Maryland, the child's and the custodial parent's domicile, to determine the child's age at which the noncustodial parent's duty of support ceases. Citing dictum in *Nevarez*, 626 A.2d at 868 n. 4, the majority appears to question this *Rittenhouse* ruling under URESA. Rather than considering whether *Rittenhouse* may reflect the choice of law that should apply in all interstate cases, whether brought under URESA or not, the majority prefers to use *Alves II*—not a URESA case—as the norm it would now apparently impose, despite *Rittenhouse*, under URESA.

judges, therefore, as a matter of course will not merely have to interpret relatively accessible Maryland or Virginia law; they will have to become versed, for example, in the child support laws of Arizona, Idaho, Arkansas, and Vermont.

The complexity of applying child support guidelines in our own jurisdiction makes clear the difficulty the courts of any jurisdiction have in applying their own laws, let alone the child support laws of other jurisdictions. *See, e.g., Robinson v. Robinson*, 629 A.2d 562 (D.C.1993); *Galbis v. Nadal*, 626 A.2d 26 (D.C.1993). Calculating the amount correctly is extremely tedious. For example, in this case, the amount of biweekly child support originally ordered under the District guideline, $502, see *ante* at 321, resulted from the following process. Bernice Mims's income, $35,000, was reduced by "the appropriate threshold amount," D.C.Code § 16–916.1(j)(1), which is $18,500 for two children, and by day-care costs, $3,900. The result of this calculation, $12,600, was divided by the amount derived by adding the $12,600 to Stephen Mims's income of $51,000, totalling $63,600. The figure produced by that calculation, 19.8%, represents Bernice Mims's expected contribution to the total amount of child support. The total amount of child support was calculated by locating Stephen Mims's income on Chart 2 of D.C.Code § 16–916.1(q), indicating the percentage applicable in a situation where the older of two children is between 7 and 12 years of age. The chart indicates that the total amount of child support is 31.9% of $51,000, or $16,269. Reducing this amount by 19.8%, the mother's expected contribution produced an annual amount of $13,048, or $502 biweekly, expected from the father. *See also Galbis*, 626 A.2d at 30 n. 6 (outlining steps in calculation); *J.A.W. v. D.M.E.*, 591 A.2d 844, 847 (D.C. 1991) (same). Our child support cases reveal that the Superior Court uses a computer program to perform these calculations and to generate the range of amounts within the trial judge's discretion.

As the majority's remand to the trial court indicates, see *ante* note 2, application of a foreign jurisdiction's guideline not only requires different calculations but also demands different findings of fact. For example, in this case, calculating the child support obligation under the Maryland guideline requires the trial court to deduct the amount Bernice Mims pays for the children's health insurance, as instructed by Md.Code, Fam. Law § 12–201(d)(3) (1991). A finding concerning this expense is not necessary under the District guideline. (As far as I am aware, the Superior Court does not have a computer program for application of the Maryland guideline or the guidelines of the other states).

Once the trial court determines the amount Bernice Mims pays for the children's health insurance, as well as the incomes of both parents under Maryland law, see *ante* note 2, the trial court can then calculate the child support obligation in accordance with the Maryland guideline. Assuming for the sake of illustration that the trial court finds that the parents have the same incomes they had at the time the temporary support order of $502 was entered, the calculations would proceed as follows. The trial court must first add the actual annual incomes of both parents ($51,000 + $35,000 = $86,000). It then must divide this amount by 12 to get the parents' combined monthly actual incomes, $7,167. As noted above, however, this amount should be reduced by the amount Bernice Mims pays for the children's health insurance, to produce an adjusted combined monthly income. The monthly amount determines the parents' basic child support obligation in accordance with § 12–204(e). The amount for two children at $7,150 is $1,351, while the amount at $7,200 is $1,357. Section 12–204(c) requires extrapolation. Therefore, the combined monthly parental obligation is $1,355. To this amount, the trial court adds child care expenses of $325 ($3,900 ÷ 12), in accordance with § 12–204(g), for a total monthly obligation of $1,680. Then, in accordance with § 12–204(a), the trial court calculates Stephen Mims's proportion of that amount by dividing $51,000 by $86,000, for a percentage of 59.3 or $995 monthly. Multiplying that amount by 12 and dividing by 26 produces a biweekly payment of $459 (compared with $502 under the District guideline).

As a result of the majority's decision in this case, the complexities of making findings and generating calculations under foreign law will now pertain not just to Maryland, where our trial judges are presumably relatively familiar with the law, but also to every jurisdiction in the United States—*e.g.*, New Mexico, Kansas, Florida, Massachusetts— that has complied with the federal mandate, *see Fitzgerald*, 566 A.2d at 724, by enacting its own child support guidelines that may be substantially different from those with which the judges in this jurisdiction are familiar. The new situation created by the majority's decision seems extraordinarily and unnecessarily impractical, especially since "governmental interest" analysis specifically allows the judiciary's familiarity with its jurisdiction's own law to serve as a decisive factor. *See Stutsman I*, 491 A.2d at 509 n. 10 (quoting *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 326 & n. 14, 101 S.Ct. 633, 647 & n. 14, 66 L.Ed.2d 521 (1981) (plurality opinion)).

## VI.

The issues here are complex and of great significance to domestic-relations practice. The majority has failed to deal with the kind of "governmental interest" analysis required for this interstate child support case. While purporting time and time again to limit its opinion to the particular "facts" or "circumstances" of this case, see *ante* at 322, 324–25 & nn. 11 & 12, the majority never addresses the trial court's conclusion, which I believe is sound, that a "false conflict" is presented here; nor does the majority explain how a trial judge now is to decide when to honor, or dishonor, this jurisdiction's traditional policy of uniformity in the resolution of interstate child support disputes, or how a judge is now to decide when foreign law is complicated enough to tilt choice of law in the District's direction. As a result, the majority has initiated a regressive choice-of-law jurisprudence that subordinates the forum law of the District—indeed, the District's interest in the obligations of its resident parents to support their children who live elsewhere—in favor of foreign laws that could minimize the child support obligations of noncustodial parents who live in the District. Without making a careful comparison of the respective govern-

mental interests, as our case law to date has defined them, the majority has reconverted District choice-of-law analysis to the simple, territorialist approach rejected long ago.

Respectfully, therefore, I dissent.