**Ricardo GALBIS, Appellant,**

v.

**Vilma NADAL, Appellee.**

**Nos. 91–FM–1065, 92–FM–77.**

District of Columbia Court of Appeals.

Argued April 22, 1993.
Decided June 10, 1993.

I.

Irena I. Karpinski, Washington, DC, for appellant.

Robert Case Liotta, Washington, DC, for appellee.

Before FERREN, STEADMAN, and SULLIVAN, Associate Judges.

FERREN, Associate Judge:

Appellant Ricardo Galbis challenges a trial court order modifying his custody rights and child support responsibilities concerning his minor son. Specifically, Galbis contends that the trial court erred (1) in concluding that there was a change in circumstances sufficient to justify the modification of a prior order for permanent custody; (2) in not lifting previously ordered restrictions on the child's overnight stays at Galbis's home; and (3) in failing to provide adequate justification for the amount of child support it ultimately ordered Galbis to pay. Concluding that the trial court did not abuse its discretion in any of these respects, we affirm.

Ricardo Galbis and Vilma Y. Nadal are the natural parents of a minor son, born September 24, 1984. Galbis and Nadal ceased living together in August 1989, and the boy continued to reside with his mother. On November 14, 1989, the trial court entered a temporary order of support requiring Galbis to pay $1,048 per month in child support, plus the costs of the child's school tuition, mental health therapy, and health insurance. Subsequently, in a final order dated April 16, 1990, the court awarded joint custody of their son to both parents, although he was to live primarily with Nadal. This order vested in Nadal the power to make all final decisions concerning the boy but required her to consult with Galbis before making any decision regarding their son's health, education, and welfare. The order also required that an adult child care provider be present during any overnight visit by the boy at Galbis's home.

In July 1991, the trial court held hearings on the parties' cross motions to modify this custody order and to enter a permanent order of support. The court then issued an order dated August 16, 1991, awarding to Nadal sole custody and exclusive decision-making authority over the child, but still requiring her to consult with Galbis concerning the boy's health, education, and welfare. The order also allowed Galbis liberal visitation rights but continued the supervision requirement for any overnight stays. The court also ordered Galbis to pay $2,471 per month in child support, to pay one-half of his son's school tuition, and to maintain both health insurance for his son and a life insurance policy naming his son as the beneficiary. On December 19, 1991, following Galbis's motion for reconsideration, the court reduced the amount of child support by $333 (one-half of the child's school tuition) to $2,138 per month but otherwise left the previous order undisturbed.

Galbis now appeals from both the August 16, 1991, order and the December 19, 1991, order.

## II.

 The trial court's determinations regarding custody of minor children, including any modifications of its initial orders, are accorded due deference and will only be reversed for an abuse of discretion. *See Fitzgerald v. Fitzgerald,* 566 A.2d 719, 721 (D.C.1989); *Rice v. Rice,* 415 A.2d 1378, 1383 (D.C.1980). However, any "modification must be based upon changed circumstances which occurred after the ... decree was entered and [which] were not contemplated by the parties at the time." *Rice,* 415 A.2d at 1383 (citations omitted); *see also Graham v. Graham,* 597 A.2d 355, 357 n. 5 (D.C.1991) ("A motion for modification ... is not to be used as a pretense to relitigate the equities of the prior decree."). Furthermore, "the specific modification ... chosen by the court ... must be supported by the findings[,] ... rationally related to the changed circumstances it purports to counter" and "reasonably calculated to promote the child's best interest and welfare." *Rice,* 415 A.2d at 1383. (citations omitted).

 In this case, Galbis argues that there was no change in circumstances sufficient to support the trial court's modification of the initial joint custody award of April 16, 1990, to sole custody on August 16, 1991. We disagree.

As the trial court noted, the April 1990 custody order had found that "both parties have been actively involved and in agreement on the major decisions regarding the child's education and welfare." Based upon this finding, this order had directed Galbis and Nadal to continue "to make the appropriate sacrifices to enable them to cooperate with each other." Upon reviewing the parents' relationship in August 1991, however, the trial court found that "the parties' ability to agree on these fundamental areas of the child's life no longer exist[ed]." Specifically, the trial court noted that there had been a series of incidents in which Galbis had acted unilaterally and in disregard of the April 1990 order's directive that final decision-making power was to be vested in Nadal.[1] Consequently, the court concluded, the circumstances had changed since the issue of the original order for joint custody.

We believe that the evidence of Galbis's repeated violations of the terms of the original custody order fully supports the trial court's conclusion that the circumstances had so changed as to render the provisions of the original order neither practical nor proper. Galbis's contention that there had been no change in circumstances because he and Nadal had bickered over their son all along amounts to nothing more than a dispute over the court's factual findings, to which we defer unless clearly erroneous. Super.Ct.Dom.Rel.R. 52(a). Since Galbis has advanced no ground on which we might conclude that the court's findings are clearly erroneous, we will not upset those findings. Moreover, in light of the trial court's factual findings, we conclude that the trial court's decision to vest sole custody in Nadal was entirely reasonable and rationally related to the change in circumstances.[2]

## III.

 Galbis also argues that the trial court abused its discretion in failing to rescind the requirement that all of his son's overnight stays be supervised by an adult child care provider, preferably the woman

---

1. These included: Galbis's refusal to continue paying for his son's therapy, against Nadal's wishes and in violation of the temporary order of support; his refusal to cooperate in his son's enrollment at a new school, including a refusal to pay tuition; his decision, over Nadal's objection, to disinter the boy's dead hamster to display the process of decay; and his decision to remove the boy from school to take him to see a psychologist, without notice to or approval from Nadal.

2. Having reached this conclusion, we need not consider Nadal's alternative arguments that (1) the new order was not really a modification of the original order and (2) a finding of changed circumstances is not really necessary in order to modify a custody order. We note, however, that the second contention conflicts with our caselaw. *See Rice,* 415 A.2d at 1383 ("Although it is indisputable that the courts have continuing jurisdiction to modify custody arrangements in the best interests of children, it is equally beyond dispute that the modification must be based upon changed circumstances....") (citations omitted).

who has been the boy's caretaker for many years. The trial court found that this requirement was justified because Galbis often works evenings (even on days when his son is visiting), because someone would have to stay with the boy during these hours in any event, and because the child's best interests would be served by the presence of his regular caretaker at these times. Moreover, the trial court found that there had been no change in circumstances justifying a modification in the original order, since Galbis's schedule had become, if anything, less flexible than it had been previously.

■ As with other aspects of child custody, we will not reverse the trial court's rulings on visitation rights absent an abuse of discretion. See Hamel v. Hamel, 489 A.2d 471, 475 (D.C.1985). The trial court has provided a rational basis for requiring supervision. Moreover, the trial court's findings indicate that, insofar as the circumstances have changed at all with regard to Galbis's schedule, they are even less favorable for leaving his son's overnight visits unsupervised than they were. Thus, it is not clear that the trial court was even obliged to reconsider its earlier ruling on visitation rights. We can see no basis in the record for concluding that the trial court abused its discretion in directing that the boy's overnight stays continue to be supervised.

## IV.

Finally, Galbis contends that the trial court failed to provide adequate justification for the amount of child support that it ultimately ordered him to pay. In order to consider the merits of this claim, we must examine in more detail the process through which the trial court arrived at its final order of $2,138 per month.

3. The revised version of D.C.Code § 16–916.1 (D.C.Law 8–150) took effect on July 25, 1990, and thus applies to this case. See J.A.W. v. D.M.E., 591 A.2d 844, 846 n. 2 (D.C.1991); 37 D.C.Reg. 5138 (1990).

4. D.C.Code § 16–916.1(f) provides as follows:

## A.

In its August 1991 order, the trial court calculated all of the minor child's needs, including all of his school tuition, as totalling $2,084. The trial court also found that Galbis's gross annual income was $175,471.40, Nadal's gross annual income was $32,016.00, and the annual cost of child care for the boy was $2,592.00. Applying the statutory child support guidelines to these figures, see D.C.Code § 16–916.1 (1992 Supp.),[3] the trial court determined that Galbis should pay $2,471.00 monthly. The trial court did not explicitly set forth the calculations it made in arriving at this figure. In addition to the monthly support amount, the court ordered Galbis to pay one-half of his son's school and summer camp tuition, to provide health insurance for his son, and to maintain a life insurance policy naming his son as the beneficiary.

Galbis moved for modification of the trial court's August 1991 order, arguing that the support amount could not exceed the child's expenses without some justification in the record. The trial court rejected this claim, noting that, while the percentages specified in the guidelines do not apply presumptively to noncustodial parents with more than $75,000 in annual income, see D.C.Code § 16–916.1(f),[4] the child support statute does not preclude the court from applying the percentages to noncustodial parents with higher incomes.

The trial court then presented more detailed calculations of Galbis's contributions at both the 23% level (i.e., the percentage of the noncustodial parent's income to be contributed for a single child aged 0–6 years, where the noncustodial parent's income is between $50,001 and $75,000, see D.C.Code § 16–916.1(q) (Chart 1)) and at the 20% level (i.e., using the 3% variation

The guideline percentage shall not apply presumptively to a noncustodial parent with income that exceeds $75,000. The amount available to a child of a noncustodial parent with income above $75,000 shall not be less than the amount that would have been ordered if the guideline had been applied to a noncustodial parent with income of $75,000.

permitted under the guidelines, *see* D.C.Code § 16–916.1(m)).[5] Applying these two percentages under the guideline formula, the trial court arrived at monthly contribution amounts of $2,908 (at the 23% level) and of $2,499 (at the 20% level).[6] The trial court did not attempt to explain the discrepancy between these figures and the amount of support it had actually ordered—$2,471 per month. Instead, the court simply noted that $2,471 was less than the 20% monthly contribution it had calculated ($2,499) and only $387 more than the amount for the child's basic needs ($2,084) as established in the record. However, the trial court did reduce the $2,471 monthly order by $333, *i.e.*, by one-half of the boy's monthly school tuition, to compensate for the fact that it had also ordered Galbis to pay one-half the tuition as an additional expense over and above the monthly support amount. Thus, the trial court ultimately ordered Galbis to pay $2,138 per month in child support (*i.e.*, $2,471 − $333 = $2,138), plus one-half of the boy's school tuition, as well as health

---

5. D.C.Code § 16–916.1(m) states that "[t]he formula established in subsection (q) of this section incorporates a variation of plus or minus 3% for each level. A variation within the plus or minus 3% limit need not be justified by written findings but specific findings are advisable." This section then specifies particular factors that should be considered in making a variation.

The trial court's application of this variation as 3% of the noncustodial parent's *gross income,* rather than 3% of the noncustodial parent's *support obligation,* is consistent with the explicit language of the old Superior Court Child Support Guideline. *See* Super.Ct.Gen.Fam.R. app. I, at 33 ("Within the discretion of the court, and in consideration of the totality of the circumstances of the parties, the order may be increased or decreased by three (3) percent (of the obligor's annual gross income)."). While the old Superior Court guideline is no longer valid, *see Fitzgerald,* 566 A.2d at 732, it still carries some weight analogous to legislative history for purposes of interpreting the present guideline, insofar as it served as the point of departure for the current guideline. *See* COMMITTEE ON THE JUDICIARY, COUNCIL OF THE DISTRICT OF COLUMBIA, REPORT ON BILL 8–461, THE CHILD SUPPORT GUIDELINE AMENDMENT ACT OF 1990, at 2–3 (1990).

6. The trial court's actual calculations were as follows. After adding together the amounts that Galbis had already paid between January and July 1991 for child support both for his son and for his daughter (from another relationship) and deducting them from Galbis's gross annual income of $175,471, the trial court arrived at an annual income figure of $163,725 for Galbis. Twenty-three percent of $163,725 is $37,657. Under the guidelines, *see* D.C.Code § 16–916.1(j), this amount is to be offset by a percentage equal to the custodial parent's gross income less the standard income disregard and child care expenses ($32,016 − $16,500 − $2,592 = $12,924) divided by the sum of both parents' incomes ($163,725 + $12,924 = $176,649), *i.e.,* $12,924 ÷ $176,649 = 0.073162 or 7.3162%. Thus, the offset to Galbis's annual contribution is .073162 × $37,657 = $2,755, yielding a net annual contribution of $34,902 ($37,657 − $2,755 = $34,902) or $2,908 per month. Twenty percent of $163,725 is $32,745. The trial court then applied the same offset amount of $2,755 as it applied at the 23% level, thereby yielding an annual contribution of $29,990 ($32,745 − $2,755 = $29,990) or $2,499 per month.

The trial court's application of the guideline formula was generally correct. *See J.A.W., supra* note 3, 591 A.2d at 847 (calculating noncustodial parent's contribution using virtually identical guideline formula from previous emergency guideline set forth in 37 D.C.REG. 3 (1990)); Super.Ct.Gen.Fam.R. app. I (giving examples of child support calculations under old Superior Court Child Support Guideline).

We note, however, three apparent errors in the trial court's calculations. First, in determining Galbis's annual income, the court should have deducted all of the payments Galbis was expected to make for his daughter's support throughout the year, not just those he had made between January and July 1991. Insofar as Galbis could be expected to continue to make support payments for his daughter, he was entitled to have *that amount* deducted from his annual income as a projected regular expense. *See* D.C.Code § 16–916.1(d) ("A prior child support order that is being paid shall be deducted from a parent's income before the child support obligation is computed in the instant case.").

Second, the trial court should not have deducted from Galbis's gross income the amount of any child support paid for his son during the current year. Rather, that amount should have been deducted, if at all, only from the total of Galbis's annual support obligation, and only to the extent that the order was to be made retroactive. Since the new order was superseding the old order, there was no reason for the court to take into account Galbis's past payments for his son in calculating the amount of income available for future payments.

Finally, it appears that the court erred in using the same offset figure in calculating Galbis's proper contributions at both the 23% and 20% levels. The proper offset amount at the 20% level was in fact $2,396 ($32,745 × .073162 = $2,396), resulting in an annual contribution of $30,349, or $2,529 monthly.

insurance for the boy and a life insurance policy naming him as the beneficiary.

### B.

■ On appeal, Galbis argues that the trial court's "award is improper in that no basis for that amount which exceeds the child's determined needs ·was provided in the Order." Essentially, Galbis contends that where the noncustodial parent has an income of more than $75,000, thereby escaping the presumptive application of the percentages set forth in the child support guidelines, *see supra* note 4, any award must be based upon the child's documented expenses. We emphatically reject that argument.

One of the basic principles of child support in the District of Columbia, embodied in both our statutory guidelines and our caselaw, is that the child is entitled to a level of support commensurate with the income and lifestyle of the parents. D.C.Code § 16–916.1(b)(3) specifically provides that:

> A parent has the responsibility to meet the child's basic needs as well as to provide additional child support above the basic needs level. The *relative standard of living of each household shall be considered* in the child support award, and a child shall not bear a disproportionate share of the economic consequences of the existence of 2 households rather than 1. When child support is established, *the child shall not live at a standard substantially below that of the noncustodial parent.*

(Emphasis added.)[7] We have taken the same approach even where the guidelines have not been applicable. Thus, in *Graham,* a case involving an increase in the noncustodial parent's income after the entry of the original support order, we held that "a trial court may act to ensure that where there is a material increase in noncustodial parents' financial resources, ... these parents do not increase their own standard of living without also ensuring that their children live as well as they." 597 A.2d at 358; *see also Benvenuto v. Benvenuto,* 389 A.2d 795, 799 (D.C.1978).[8]

It is true, as Galbis points out, that we have traditionally said the trial court should consider both the needs of the child and the parents' ability to pay, in determining the initial amount of child support and any subsequent modification. *See Graham,* 597 A.2d at 357; *E.R.B. v. J.H.F.,* 496 A.2d 607, 612 (D.C.1985); *Benvenuto,* 389 A.2d at 798. But both D.C.Code § 16–916.1(b)(3) and our decision in *Graham* make it clear that the child's needs should not be interpreted so narrowly as to deprive the child of the quality of life enjoyed by the noncustodial parent. *See also Benvenuto,* 389 A.2d at 799 ("One factor which may be considered in determining the needs of the child is the standard of living which the child would have enjoyed had the marriage not been dissolved.").[9]

■ Nor do we believe that the trial court's application of the guideline percentages to Galbis's income is barred by the Code provision that "[t]he guideline percentage shall not apply presumptively to a noncustodial parent with income that exceeds $75,000." D.C.Code § 16–916.1(f). There is nothing in this section that absolutely prohibits the application of the guide-

---

7. This approach accords with federal regulations requiring all states receiving federal funds for child support enforcement and Aid to Families with Dependent Children to establish child support guidelines that "[t]ake into consideration all earnings and income of the absent parent." 45 C.F.R. § 302.56(c)(1) (1992); *see generally* 42 U.S.C. § 667 (1991).

8. *See also* 2 JEFF ATKINSON, MODERN CHILD CUSTODY PRACTICE § 10.11, at 503 (1986):

> A standard applied in most states is that a child, to the extent possible, should be able to enjoy the same standard of living after the

divorce as before the divorce. The standard of living can include not only bare necessities, but also the "comforts and luxuries of life." (Footnotes omitted.)

9. *See generally* 2 ATKINSON, *supra* note 8, § 10.11, at 503:

> In states where the support statutes or case law make reference to meeting the child's "reasonable expenses" or "necessities," the meaning of those flexible terms may vary with the financial status of the family, the customs of the family's social circle, and special needs of the child.

line percentages in a case such as the one before us. The section says only that the guideline percentage "shall not apply presumptively," not that the guideline percentage "shall not apply." Reading this section in the context of the statute as a whole,[10] we believe it is clear that D.C.Code § 16–916.1(f) was intended only as an exception from the statute's general directives that "[a]pplication of the guideline shall be presumptive" and that "[d]epartures shall be set forth and explained in writing" in light of "factors that may be considered to overcome the presumption." D.C.Code § 16–916.1(l). In other words, whereas the trial court must justify in writing any departure from the guideline formula when the noncustodial parent has an annual income of $75,000 or less, the court is not so obliged to adhere to the guideline percentages or justify deviations in writing when the noncustodial parent has an annual income over $75,000. D.C.Code § 16–916.1(f) thus merely allows the trial court greater discretion in determining an appropriate award amount when the noncustodial parent is relatively wealthy; it does not exempt that parent from the general principle that underlies the guidelines as a whole: that support payments shall be commensurate with parental income. We conclude, therefore, that the trial court did not abuse its discretion in relying on the guideline formula, rather than on a strict accounting of the child's needs, in determining the amount of Galbis's support obligation.[11]

■ Furthermore, we see no ground for reversal in the few technical quibbles we have with the trial court's actual calculations in applying the guideline formula, *see*

*supra* note 6, or in the small unexplained discrepancy between the support amount actually ordered by the trial court and the figure it later arrived at using the 20% guideline formula (*i.e.*, $2,138 + $333 = $2,471 vs. $2,499).[12] Bearing in mind that in this case the trial court was not obligated in the first place to apply the guideline formula, that the trial court's apparent mistakes appear to have favored appellant primarily, and that recalculation would result in relatively minor changes in the actual order, we consider such errors as not "of a magnitude to require reversal." *Johnson v. United States*, 398 A.2d 354, 366 (D.C. 1979) (emphasis omitted). Although the statutory guidelines have limited the trial court's freedom in determining the proper amount for a child support award, the ultimate decision on such an award is still confided to the trial court's sound discretion, *see Negretti v. Negretti*, 621 A.2d 388, 391 (D.C.1993); *Weiner v. Weiner*, 605 A.2d 18, 21 (D.C.1992), and "we are prepared to countenance imperfections in the trial court's exercise of discretion to enjoy more fully the advantages of making the determination discretionary," *Johnson*, 398 A.2d at 366. *See J.A.W. v. D.M.E.*, 591 A.2d 844, 847 (D.C.1991) (upholding child support award consistent with applicable emergency child support guidelines, even though trial court did not actually apply guideline percentages and amount awarded was slightly different from amount that would have been awarded using standard guideline formula).

*Affirmed.*

---

**10.** *See* 2A NORMAN J. SINGER, SUTHERLAND ON STATUTES AND STATUTORY CONSTRUCTION § 47.02, at 139 (5th ed. 1992) (The "whole act" method of statutory interpretation "is the most realistic in view of the fact that a legislature passes judgment upon the act as an entity, not giving one portion of the act any greater authority than another. Thus any attempt to segregate any portion or exclude any other portion from consideration is almost certain to distort the legislative intent.")

**11.** This is not to say that it is necessarily appropriate to apply the guideline percentages in every case where the noncustodial parent has an

annual income greater than $75,000. *See Hubert v. Hubert*, 159 Wis.2d 803, 465 N.W.2d 252, 256 (Ct.App.1990) (noting that "in cases where the parties have a substantial marital estate and income far beyond the average income of most people, the robotistic utilization of the percentage standards may give absurd results").

**12.** For purposes of comparing these figures, we add, to the $2,138 specifically labeled as child support by the court, the $333 that the court chose to treat as a separate payment for one-half tuition, because tuition would normally be included in calculating the child's needs.