# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 1999-CA-00994-SCT

*ERIC SHANNON MOULDS*

*v.*

*BRIDGET BUSHAY FAIRLEY BRADLEY*

| | |
|---|---|
| DATE OF JUDGMENT: | 05/13/1999 |
| TRIAL JUDGE: | HON. PAT H. WATTS, JR. |
| COURT FROM WHICH APPEALED: | GEORGE COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | GARY L. ROBERTS |
| ATTORNEY FOR APPELLEE: | ROBERT PAYNE SHEPARD |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED IN PART AND REVERSED AND REMANDED IN PART - 08/02/2001 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 8/23/2001 |

**EN BANC.**

**WALLER, JUSTICE, FOR THE COURT:**

¶1. This appeal involves a father who failed to make court-ordered child support payments and was found guilty of criminal contempt and sentenced to serve thirty days in jail. Bridget Bradley filed a complaint seeking to enforce and modify an earlier child support decree. The complaint was later amended to include the request for the imposition of punitive damages against Eric Shannon Moulds, the father of the couple's child. Although the chancellor refused to award punitive damages, he did find Moulds guilty of criminal contempt, sentencing him to ninety days in the county jail, with sixty days suspended. Finding that the issue of criminal contempt was not properly before the court, we reverse his conviction and sentence. On cross-appeal we affirm the denial of Bridget's claim for an award of punitive damages, but we reverse and remand for the Chancellor to review the award of child support based on the correct amount of Moulds's adjusted gross income.

## FACTS AND PROCEEDINGS BELOW

¶2. On January 12, 1996, the Chancery Court of George County entered a decree finding Eric Shannon Moulds to be the natural father of Randy Moulds. The decree ordered Moulds, at the time a college student and football player at Mississippi State University, to pay weekly child support in the amount of fifty dollars

to Randy's mother, Bridget Bradley. The decree also ordered Moulds to provide medical and dental insurance for Randy when he was financially able to do so. Moulds is also the natural father of three other children by other women, for whom he is currently paying child support.

¶3. Following his collegiate playing career, Moulds was drafted by the Buffalo Bills of the National Football League, where he earned an annual salary in excess of $1 million. Despite his improved financial condition, between January 12, 1996, and September 21, 1998, Moulds paid Bradley only $350 in child support and provided no insurance. On September 14, 1998, Bradley filed an amended complaint seeking to enforce the earlier child support decree and to increase the weekly support amounts.[1] On January 7, 1999, Moulds finally paid off his child support arrearage by tendering a check to Bradley in the amount of $7,108.29. On January 11, 1999, Bradley filed a second amended complaint seeking, among other things, an increase in the child support amounts and the imposition of punitive damages for Moulds's past failure to pay child support. At the hearing, held May 11, 1999, the Chancellor raised the possibility of jail time as punishment for Moulds. Bradley had not requested incarceration in her pleadings, and, upon being questioned by the Chancellor, specifically said that she preferred that Moulds be required to pay her punitive damages and not face incarceration. The Chancellor nevertheless found Moulds guilty of wilful, contumacious and criminal contempt and sentenced Moulds to ninety days in the county jail, with sixty days suspended. The Chancellor also found Moulds's increased income was a material change in circumstances and increased Moulds's monthly child support obligation from $200 per month to $1,000 per month.

¶4. Moulds filed a timely appeal to this Court from the Chancellor's order finding him guilty of criminal contempt and sentencing him to jail. Bradley cross-appealed, arguing that the amount of child support awarded by the Chancellor inadequate and that the Chancellor erred in not awarding punitive damages against Moulds.

## DISCUSSION

**Whether Moulds was deprived of due process of law when the chancery court convicted him of criminal contempt and sentenced him to jail for 30 days?[2]**

¶5. Moulds argues that the Chancellor improperly ordered him incarcerated for criminal contempt without meeting the due process requirements applicable to criminal contempt proceedings. We agree.

¶6. The record clearly indicates that the Chancellor found Moulds to be guilty of criminal, rather than civil, contempt. Although a Chancellor has discretion to impose sanctions for both criminal and civil contempt, there is an important distinction between these two forms of contempt. This Court has explained that civil contempt is to coerce action while criminal contempt is to punish for violation of an order of court:

> If the purpose of the proceedings is to coerce action or non-action by a party, the order of contempt is characterized as civil. This type contempt proceeding is ordinarily instituted by one of the parties to the litigation who seeks to coerce another party to perform or cease performing an act. The order of contempt is entered by the court for the private benefit of the offended party. Such orders, although imposing a jail sentence, classically provide for termination of the contemnor's sentence upon purging himself of the contempt. The sentence is usually indefinite and not for fixed term. Consequently, it is said that the contemnor 'carries the key to his cell in his own pocket.' [citations omitted] On the other hand, a criminal contempt proceeding is maintained solely and simply to vindicate the authority of the court or to punish otherwise for conduct offensive to the public in violation of an order of the court.

*Newell v. Hinton*, 556 So. 2d 1037, 1044 (Miss.1990); *see also* **Sappington v. Sappington**, 245 Miss. 260, 147 So. 2d 494, 498 (1962); Miss. Code Ann. §§ 9-1-17 & 9-5-87 (1991 & Supp. 2000).

¶7. There are two forms of criminal contempt: direct and constructive. Direct criminal contempt involves words spoken or actions committed in the presence of the court that are calculated to embarrass or prevent the orderly administration of justice. **Varvaris v. State**, 512 So. 2d 886, 887 (Miss. 1987). Punishment for direct contempt may be meted out instantly by the judge in whose presence the offensive conduct was committed, though we have stated that it is wise for a judge faced with personal attacks to wait until the end of the proceedings and have another judge take his place. **Purvis v. State**, 657 So. 2d 794, 798 (Miss. 1995) (citing *Mayberry v. Pennsylvania*, 400 U.S. 455, 463-64, 91 S. Ct. 499, 504, 27 L. Ed. 2d 532 (1971)).

¶8. Unlike direct contempt, constructive contempt involves actions which are committed outside the presence of the court. **Coleman v. State**, 482 So. 2d 221, 222 (Miss.1986); **Wood v. State**, 227 So. 2d 288 (Miss.1969). Because the alleged contempt (failure to make court-ordered child support payments) occurred outside the presence of the court and Moulds had already paid his obligations, the jail time imposed by the Chancellor was for constructive criminal contempt. In the case of constructive criminal contempt, we have held that defendants must be provided with procedural due process safeguards, including a specification of charges, notice, and a hearing. **Purvis**, 657 So. 2d at 798 (citing **Wood,** 227 So. 2d at 290).

¶9. The record clearly supports Moulds's assertion that he was not provided with any notice that he would be tried for criminal contempt at the May 11, 1999, hearing. The contempt sought by Bradley was for the imposition of civil, rather than criminal, sanctions. Bradley's complaint repeatedly states, for example, that "the defendant is in wilful contempt of Court, and this Court should take whatever action is necessary to compel the defendant" to take various actions to comply with the previous orders of the court, including releasing tax returns and providing his address and telephone number. A review of the record indicates that when questioned by the Chancellor about the possibility of Moulds being incarcerated, counsel for Bradley emphatically stated, "I do not think he should go to jail. . . . Incarceration would be counterproductive for my client. . . . If he goes to jail that could affect his income. . . . What we asked for in the complaint, we felt sufficient to get his attention without the need of putting him in jail. . . ." Given the language of the complaint and the above exchange, it is clear that what was sought was the use of civil contempt sanctions to compel, rather than criminal contempt sanctions to punish Moulds.

¶10. Without notice of criminal contempt sanctions, Moulds's due process rights were violated. Accordingly, we reverse Moulds's criminal contempt conviction and jail sentence.

## CROSS-APPEAL ISSUES

### I. Whether the trial court erred in awarding Bradley only $1,000 per month child support where Moulds, had an adjusted gross income of more than $750,000.00.

¶11. Bradley argues on cross-appeal that the Chancellor erred in requiring Moulds to pay only $1,000 per month in child support. Bradley argues that the Chancellor miscalculated Moulds's adjusted gross income, and the record supports this assertion. In providing his rationale for increasing Moulds's child-support obligation to $1,000 per month, the Chancellor stated, "This Court has looked at the living expenses of the father which is alleged to be $14,170 a month, which is due out of his adjusted gross income of $32,108.57

a month."

¶12. Bradley suggests that the Chancellor arrived at the erroneous conclusion that Moulds's annual adjusted gross income was $ 385,302.84 by deducting taxes from Moulds's adjusted gross income provided in his U.C.C.R. 8.05 disclosure statement. Bradley argues that the Chancellor, in reaching his decision, substantially underestimated Moulds's adjusted gross income by more than $300,000 a year:

> That the adjusted gross income of the defendant (Moulds) annually was $385,302.84. In fact, the adjusted gross income was $ 761,435.11. The Chancellor apparently went solely by Moulds' 8.05 statement, without comparing it to Moulds' tax returns. As a result, while the monthly salary was stated as $ 54,166.57 plus 5000 for endorsements, the 1997 tax return attached to the 8.05 showed wages of $ 1,304,163 which alone equates to a gross monthly salary of $ 108,680.25. Apparently, Moulds listed his net monthly salary on the 8.05, and then the Chancellor compounded the error by deducting the taxes and allowed withholdings from it, which resulted in the $ 300,000+ shortage in the finding as to Moulds' income.

It is apparent that the Chancellor incorrectly calculated Moulds's adjusted gross income. Moulds does not argue otherwise in his brief.

¶13. However, the Chancellor expressly stated that he was basing his award of $1,000 per month in child support on the needs of the child rather than on the amount of Moulds's salary. In making the required on the record finding for a guidelines departure pursuant to Miss. Code Ann. § 43-19-101 (2000),[3] the Chancellor stated that:

> [T]he Court finds that the application of the guidelines in this case are unjust and inappropriate due to the evidence presented as to the needs of the child. Now, we do look at the ability of the father to pay child support, but that is only one factor in reference to the child support. The paramount concern are [sic] the needs of the child. Therefore, the Court finds that the child support should be increased to $ 1,000/month and this should be retroactive to the filing of the complaint on October 15, 1996.

¶14. In child support modification proceedings the Chancellor is accorded substantial discretion and is charged to consider all relevant facts and equities to the end that a decree serving the best interest of the child may be fashioned. This Court's standard of review on appeal is the familiar abuse of discretion standard. *Clark v. Myrick*, 523 So. 2d 79, 82 (Miss. 1988).

¶15. In making his ruling, the Chancellor expressly considered and discussed such factors as the child's financial and medical needs, age, cost of schooling, inflationary influences in the community, Moulds's level of income, and the financial condition of Bradley. Even cases in which a parent has extraordinary wealth, the essential purpose of child support remains the support of the child. Miss. Code Ann. § 93-9-7 (1994). However, we are unable to conclude whether an award of $1,000 per month for the support of one child is adequate without the benefit of the Chancellor's analysis using Moulds's correct annual adjusted gross income. The marked disparity between Moulds's income and the amount he is required to pay in child support warrants that this issue be revisited by the Chancellor.

¶16. As such, the Chancellor's ruling on the issue of the amount of child support payable by Moulds is reversed and remanded.

### II. Whether the trial court erred in dismissing Bradley's claim for punitive damages.

¶17. There is no precedent in this State's jurisprudence for the award of punitive damages as a sanction for failing to pay child support. Moreover, Bradley does not cite any authority from other jurisdictions in support of this practice. After a diligent search, we could find only one court awarding punitive damages for criminal contempt, which was deemed a fine, payable to the court, not the opposing party.[4] Accordingly, the Chancellor did not err in denying Bradley's claim for an award of punitive damages.

## CONCLUSION

¶18. Moulds's conviction for criminal contempt and imposition of jail sentence is reversed. The trial court's judgment is affirmed as to the dismissal of the claim for punitive damages, but reversed and remanded for reconsideration of the child support issue based upon Moulds's correct adjusted annual gross income. Pending the Chancellor's decision on remand of the child support issue, Moulds shall continue to pay Bradley $1,000 per month in child support for the use and benefit of Randy Moulds.

¶19. **ON DIRECT APPEAL: REVERSED. ON CROSS-APPEAL: AFFIRMED IN PART AND REVERSED AND REMANDED IN PART.**

**PITTMAN, C.J., SMITH, MILLS, AND COBB, JJ., CONCUR. EASLEY, J., CONCURS IN RESULT ONLY. DIAZ, J., CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY MILLS AND EASLEY, JJ. SMITH, WALLER AND COBB, JJ., JOIN THIS OPINION IN PART. BANKS, P.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY McRAE, P.J.**

**DIAZ, JUSTICE, CONCURRING:**

¶20. I agree with the majority that the chancellor correctly denied Bradley's request for punitive damages. I likewise concur with the majority's decision to reverse Moulds's criminal contempt conviction and sentence. While I also agree that the chancellor's award of child support should be remanded for calculation based upon an accurate accounting of Moulds's adjusted gross income, I write separately to address the underlying standards our trial courts utilize when determining what constitutes an adequate award of child support.

¶21. Our Legislature has spoken on the issue of child support via Miss. Code Ann.§ 43-19-101(1) (2000) wherein enumerated guidelines establish a rebuttable presumption in all judicial or administrative proceedings that one child is entitled to fourteen percent of the father's adjusted gross income. . The guidelines provided in subsection (1) apply unless the judicial or administrative body awarding or modifying the child support award makes a written or specific finding on the record that the application of the guidelines would be unjust or inappropriate in a particular case as determined under the criteria specified in Miss. Code Ann. § 43-19-103.[5]

¶22. The statute reminds us that the amount of "adjusted gross income" as that term is used in § 43-19-101(1) is calculated by including gross income from all potential sources[6] that may reasonably be expected to be available to the absent parent. Miss. Code Ann.§ 43-19-101(3) (2000). Further, when the adjusted gross income of the absent parent is more than $50,000, as is the case here, the court must make a written finding on the record as to whether or not the application of the guidelines established in this section is reasonable. *Id*.

¶23. Moulds's situation is rather unique, comparatively speaking. Most child support cases center on the non-custodial parent's inability, often coupled with an unwillingness, to pay adequate child support. Finally, after lo these many years, Moulds testified that he is ready to accept responsibility for his children and set an example for them by paying all child support currently in arrears. He further testified that he wanted to provide them with opportunities and material possessions that he did not have as a child. I believe this is the hope of every parent for their child. Since Moulds is willing and certainly financially able to offer this support, we must look to the peculiarities of the situation to determine what amount would be reasonable under his circumstances.

¶24. What constitutes "reasonable needs" for a child varies with the circumstances of the parties involved. The duty to support a child covers more than the mere necessities of life if the parent can afford to pay more. The majority noted that even in cases in which a parent has extraordinary wealth, the essential purpose is to support the child. I agree. However, this raises the question of "support to what extent?" Often, alimony is awarded to a spouse in a divorce action. Alimony should be reasonable in amount and commensurate with the wife's accustomed standard of living, considering the ability of the husband to pay. *Brendel v. Brendel,* 566 So.2d 1269, 1272-73 (Miss. 1990). Among the familiar factors set out for consideration to determine the amount of alimony in *Brabham v. Brabham,* 226 Miss. 165, 84 So.2d 147 (1955) are the health of the husband and his earning capacity, the entire sources of income of both parties, the reasonable needs of the child. *Brabham,* 226 Miss. at 176, 84 So.2d at 153. Additionally, Miss. Code Ann. § 93-5-23 (Supp. 2000)[7] provides that each parent must provide support and maintenance relative to their financial ability.

¶25. Obviously, there was no marriage in the case sub judice, and Randy's status as an illegitimate child is uncontested. However, the principle remains the same. After an adjudication of paternity, an illegitimate child's legal relationship to the father with regard to financial support is no different than that of a legitimate child born to a marriage that ended in divorce. It flies in the face of good sense to base alimony, in part, on the spouse's ability to pay and not give the same consideration to child support. When child support is given in connection with alimony, the child receives the benefit of living in a style in which the recipient spouse is accustomed in addition to the amount paid specifically for the benefit of the child. By not extending the same consideration to illegitimate children, we effectuate a double standard in which the child suffers through no fault of their own. I believe that when awarding child support, the chancellor should award an amount sufficient to maintain the child in a lifestyle which the non-custodial parent is capable of supporting.

¶26. This theory is well founded law in numerous jurisdictions. The standard of living to which a child is entitled should be measured in terms of the standard of living attainable by the income available to the parents rather than by evidence of the manner in which the parents' income is expended and the parents' resulting lifestyle. *White v. Marciano,* 235 Cal. Rptr. 779, 782 (Cal. Ct. App.1987). Children are not expected to live at a minimal level of comfort while one or more parents enjoy a luxurious lifestyle; they are entitled to a part of the bounty of one parent's good fortune. *In re Marriage of Nimmo*, 891 P.2d 1002, 1007 (Colo.1995). The trial court should not limit the amount of child support to the child's 'shown needs,' because a child is not expected to live at a minimal level of comfort while the non-custodial parent is living a life of luxury. *People ex rel. Graham v. Adams*, 608 N.E.2d 614, 616 (Ill. App. Ct. 1993). The fact that the mother was able to meet the basic needs of the children on less support than she requested does not mean that the children do not have needs that should be addressed by a further increase in child support because the term "need" refers to the general standard of living commensurate with income of parents. *Harris v. Harris,* 714 A.2d 626, 633 (Vt. 1998). When a court is required to exercise discretion in setting

a child support obligation, the court must consider the reasonable needs of the child and the *obligor's ability to pay*. **Havens v. Henning,** 418 N.W.2d 311, 312 (S.D.1988). *See also* **Galbis v. Nadal,** 626 A.2d 26, 31 (D.C. 1993)(holding that a child's needs should not be interpreted so narrowly as to deprive child of quality of life enjoyed by non-custodial parent); **Bagley v. Bagley,** 632 A.2d 229, 239 (Md. Ct. Spec. App. 1993) (holding that children are entitled to every expense reasonable for a child of affluent parent). These cases reflect the same reasoning as is found in Miss. Code Ann. § 43-19-103, which also requires consideration of the total available assets of the obligor.

¶27. The majority noted that Moulds's gross monthly salary at the time of trial was approximately $108,600. Since adjudication of this matter, it has been widely reported in the national press that Moulds signed a new six-year contract with the Buffalo Bills totaling just under $60 million, including a $12.5 million signing bonus. Using, for example, a conservative estimate of $40 million over six years will produce a monthly salary of almost $560,000 payable to Moulds. This amount is exclusive of any endorsement contracts, public appearances, and other investments that he may have, all of which should be considered per the language of Miss. Code Ann.§ 43-19-101(3) (2000).

¶28. On remand, I would allow evidence to be presented concerning changes in the financial conditions of the involved parties to calculate new support payments for Randy. The flexible nature of Moulds's career and our interest in judicial economy warrant that Moulds's present financial condition be considered by the chancellor, thus preventing the need for Bradley to file an immediate petition for modification of child support.

¶29. The law presumes that Randy is entitled to child support in the amount of fourteen percent of Moulds's adjusted gross income. Based solely upon those guidelines, Moulds should have been required to pay approximately $8,800 per month under his previous salary. Even if the chancellor finds special circumstances that require departure from the established guidelines, he should not depart downward in a case like this. This fact is made abundantly clear when it was noted at trial that Moulds spent approximately $1500 per month on clothes and $200 per month on child support to Randy, when he chose to pay it. Under the chancellor's findings, the new $1000 threshold is still only approximately one percent of Moulds's previous income. This is unacceptable.

¶30. If Moulds is less than forthcoming with the details of his financial affairs, as was the case at trial, I note that it has been held that "where the extraordinarily high earner resists detailed discovery of his or her financial affairs, the trial court may make such assumptions concerning his or her net disposable income, federal income tax filing status, and deductions from gross income as are least beneficial to the extraordinarily high earner." **Johnson v. Superior Court,** 77 Cal.Rptr.2d 624, 627 (Cal. Ct. App. 1998).

¶31. As *Albright* indicates, the polestar consideration is the best interest of the child. **Albright v. Albright,** 437 So. 2d 1003, 1005 (Miss. 1983). I fail to grasp how denying a child the fruits of his father's success can be said to be in the child's best interest.

**MILLS AND EASLEY, JJ., JOIN THIS OPINION. SMITH, WALLER AND COBB, JJ., JOIN THIS OPINION IN PART.**

**BANKS, PRESIDING JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶32. I agree with most of what the majority says, but, in my view, a correct assessment of Moulds's adjusted gross makes no difference here, given the fact that it has no bearing on his ability to pay and the chancellor clearly based his award upon the needs of the child. Accordingly, I respectfully dissent from that portion of today's disposition which reverses and remands this case on that issue.

¶33. The needs of the child will not change with a correct analysis of "adjusted gross." The chancellor's award was $1,000 per month. Clearly, the error in calculating adjusted gross had no impact upon the chancellor's conclusion concerning the reasonable needs of the child. There was room, within the guidelines, to give a greater amount of support had the chancellor been of the view that the reasonable needs of the child demanded as much.

¶34. Justice Diaz's suggestion that child support should be analogized to alimony and adjusted because support comes to one percent of Moulds's income is, in my view, misguided. Child support levels are established, in many instances, where there is no "accustomed" standard of living. Moreover, alimony contains elements of a division of assets after a termination of the marital partnership inappropriate to the parent child relationship. Child support payments are geared to the needs of the child and the parents' obligation to provide for those needs. There is no requirement in law that a parent transfer wealth to a child.

¶35. While it is true that *reasonable* needs of the child of one who is affluent may be more in some instances than the child of one less able to afford the same choices, those differences may not be assumed. For example, a child of an affluent parent who has started a private school and developed a level of comfort there may be deemed to reasonably need to continue. A child with special educational needs may reasonably need additional educational or other expenditures which might be out of reach for a poor but easily within the capability of one who is affluent.

¶36. That is not shown to be the case here. The guidelines establish an annual income of $50,000 as the presumptive maximum level for child support at a level of 14% of income for one child and 24% for four children. That would provide child support payment of $567 per month and $1,000 per month for four. For incomes in excess of that $50,000 amount, the court is required to make an explicit finding as to whether the guideline is appropriate.

¶37. The chancellor here explicitly calculated the amount that application of the guidelines would produce for four children, $92,472.68 or $ 23,118.17 per child for the four children Moulds is required to support. The chancellor's analysis showed monthly income of $18,000 **after deducting for Moulds's living expenses**, making even that amount well within Moulds's ability to pay. The court then considered **the plaintiff's estimate of the child's needs, $664.29 per month**. The court concluded that:

> [i]f the Court applied the guidelines, the plaintiff would be awarded the sum of approximately $1900 a month for child support. There has been no testimony which justifies the child support to be $1900 per month. Therefore, the Court finds that the application of the guidelines in this case are unjust and inappropriate due to the fee (sic) presented as to the needs of the child.

¶38. The chancellor fully considered the needs of the child and a guideline figure well within that which Moulds could afford given the income figures that the chancellor used. The chancellor found that the guideline figure was excessive. No consideration of a greater income can change that fact. There is no basis for reversal on this issue. I would affirm the judgment of the chancery court as to child support.

**McRAE, P.J., JOINS THIS OPINION.**

1. Bradley originally filed a Complaint for Modification and Contempt on October 18, 1996, on which no action was taken until the Amended Complaint was filed October 15, 1998.

2. Although Moulds raises a second issue regarding certain remarks and conduct of the Chancellor in determining to incarcerate Moulds, we find his first issue dispositive, and decline to address the second issue.

3. (4) In cases in which the adjusted gross income as defined in this section is more than Fifty Thousand Dollars ($50,000.00) or less than Five Thousand Dollars ($5,000.00), the court shall make a written finding in the record as to whether or not the application of the guidelines established in this section is reasonable.

4. *See **Marriage of Nussbeck**,* 974 P.2d 493, 498-99 (Colo. 1999).

5. Miss. Code Ann. § 43-19-103 reads in relevant part:

> The rebuttable presumption as to the justness or appropriateness of an award or modification of a child support award in this state, based upon the guidelines established by Section 43-19-101, may be overcome by a judicial or administrative body awarding or modifying the child support award by making a written finding or specific finding on the record that the application of the guidelines would be unjust or inappropriate in a particular case as determined according to the following criteria:

> (h) Total available assets of the obligee, obligor and the child.

> (i) Any other adjustment which is needed to achieve an equitable result which may include, but not be limited to, a reasonable and necessary existing expense or debt.

6. These potential sources of income include, but are not limited to, the following: wages and salary income; income from self employment; income from commissions; income from investments, including dividends, interest income and income on any trust account or property; annuity and retirement benefits, including an individual retirement account (IRA); any other payments made by any person, private entity, federal or state government or any unit of local government; any income earned from an interest in or from inherited property; any other form of earned income.

7. Miss. Code Ann. § 93-5-23 reads in pertinent part:

When a divorce shall be decreed from the bonds of matrimony, the court may, in its discretion, having regard to the circumstances of the parties and the nature of the case, as may seem equitable and just, make all orders touching the care,custody and maintenance of the children of the marriage. However, where *proof shows that both parents have separate incomes or estates, the court may require that each parent contribute to the support and maintenance of the children of the marriage in proportion to the relative financial ability of each.* (emphasis added).